PITZMAN, *Appellant*, v. BOYCE *et al.*

Division One, July 2, 1892.

1. **Easement:** SEWER: ADVERSE USER. The use of a sewer placed by one, on the land of another without the latter's consent, but with his knowledge, is not adverse,—but permissive.

2. ———: ———: REVOCABLE LICENSE. Such a use is merely a revocable parol license, and this is true notwithstanding any expenditures by the licensee.

3. ———: ———: ———: NOTICE OF REVOCATION. The licensor is not required in such case before severing the connection between the sewer on his own and the adjoining land of the licensee to give notice to the latter of his intention to do so.

4. ———: ———: ———: ———. Such severance operates as a revocation of the license.

*Appeal from St. Louis City Circuit Court.*—HON. JACOB KLEIN, Judge.

AFFIRMED.

PETITION for injunction in order to prevent the defendants from removing certain sewer pipes and connections whereby plaintiff was enabled to drain his premises by arranging his pipes, so as to effect that purpose by means of a sinkhole on the defendant Boyce's lot. The other defendants are agents of said defendant, and employed by her to do the work of removal. Facts as follows:

Plaintiff is the owner of a lot of ground, two hundred and eighty-two feet in front on the east line of Compton avenue, extending eastwardly three hundred and sixty-six feet, and bounded north by Geyer avenue. Immediately east of plaintiff's lot the defendant owns a lot fronting one hundred and thirty-two feet on the

south line of Geyer avenue, and extending south-wardly beyond the south line of plaintiff's lot. The lot of the defendant, Mary E. Boyce, constituted part of the estate of her mother, Octavia Boyce, and was allotted to her in the partition of Mrs. Boyce's estate in 1879. On this lot of the defendant there is what is called a sinkhole which serves as a natural drain by means of an open subterraneous passage supposed to connect with the Mississippi river.

In 1868, the plaintiff commenced the erection of a stable in the rear of his lot, and finished it in 1869. Upon its completion he cut an open drain or ditch from the stable to the sinkhole on Mrs. Boyce's lot, for the purpose of draining his stable and the surface water into the same. In 1870, he erected his dwelling-house on his lot, and when this was completed he laid sewer pipe so as to drain both the house and stable, and carried these pipes over Mrs. Boyce's lot to the mouth of the cave. The sewer pipe was laid beneath the surface of the ground, or was covered slightly by heaping ground around and over it, but after a short time parts of the pipe were exposed so as to be visible to anyone going on the land.

Later, in 1870, plaintiff joined with some of his neighbors who had erected houses in the neighborhood and put down a more substantial sewer, and at the same time constructed a stone inclosure around the cave in Mrs. Boyce's lot. This structure was made twelve or fifteen feet high above the surface of the ground, and it was plainly visible from that time forward until the spring of 1889, at which time it was three or four feet above the ground. It appears that this inclosure or chimney, as it is termed by the witnesses, was built so as to prevent the cave or open-ing from being filled or choked up, and that by the natural washing of the earth around it and from other

causes the depression was gradually filled up around
the chimney until only three or four feet remained
visible, and these were finally filled up and a cover put
over the chimney, so as to keep the cave and subterra-
neous passage below open.

In 1877, the plaintiff and others who were then
using this drain raised the inlet of the sewer so used,
and straightened the line of pipe, and at a considerable
expense, of nearly $400 or $500, made a sewer system
of the drain theretofore used, so that quite a number
of houses were connected with it. And the inlet was
again raised some time in 1880 or later.

Whatever was done on the premises of Mrs. Boyce,
and after the partition of the lot of Miss Boyce, was done
openly, and in such manner that anyone could see the
acts; and the use of the drain or sewer and cave or
inlet on the servient lot was such that anyone could see
it or by any attention could learn of it without diffi-
culty; and there is some evidence that this use was
known to the city officials in the sewer and health
departments. Neither the plaintiff nor any of the
other house-owners who made use of this sewer and
inlet or cave ever asked anyone's consent for this
use; and until the summer of 1889 no one seems to
have objected thereto. Mrs. Boyce resided not far
from these premises.

Mrs. Boyce knew that the chimney had been built
on her lot, and also the purpose thereof. Some time
in 1874 or 1875, Mr. Pitzman informed her in a con-
versation at her house about their use of her property,
and that they were all draining into her property, and
she answered, "I hope you won't injure it." There is
also evidence tending to prove that Miss Boyce, the
defendant, through her agent, Mr. Carpenter, who had
charge of the property, had actual notice of the use
being made of her property by the plaintiff and others

early in 1879.   Although Mr. Carpenter never was the
agent of Miss Boyce alone, he had charge of all the
property as agent for all the heirs and acted as one of
the commissioners in the partitioning of the estate.
Mr. Pitzman was also one of the commissioners, and
he seems to have pointed out the tower or chimney
around the inlet when they were on the property in
June or July, 1879.   The commissioners did not con-
sider the existence of this chimney and the fact that
the surrounding houses were drained into this property
as affecting its value.

In the summer of 1889, the defendants being about
to sever the sewer connections and pipe running into
the chimney around the cave on the property of
Miss Boyce, plaintiff procured a temporary injunction
to restrain her from disturbing the same, and on trial
of the case the facts developed were substantially as
above set forth.   It also appeared in evidence that
plaintiff's property has no connection with the sewer
system of the city, and that until recently it was
practically impossible to make any such sewer connec-
tion, and that to make such connection to-day would
entail an expense of about $5,000 on plaintiff.

By reason of these facts, plaintiff claims to have
acquired a right by prescription to continue the dis-
charge of his sewage into the cave and subterraneous
passage in defendant's land; defendants deny such
right and claim that the temporary injunction should
be dissolved.

The circuit court took the view contended for by
defendant Boyce, dissolved the temporary injunction,
dismissed the petition, and plaintiff appeals.

*Fred Wislizenus* for appellant.

(1)   Plaintiff had acquired an easement through
adverse user.   *First.*   There arises a presumption that

the user was adverse when it was continuous, open and notorious. *Mebane v. Patrick*, 1 Jones (N. C.) 23. *Second.* The evidence in the case shows that the user was in fact adverse. (2) If plaintiff's use was not adverse it was under license, and defendant's conduct in permitting plaintiff to improve his own property, and also to expend money on defendant's property, estops defendant from revoking the license, at least without tendering compensation. *Allen v. Mansfield*, 82 Mo. 688; *Baker v. Railroad*, 57 Mo. 265; *Gibson v. Mech. Ass'n*, 33 Mo. App. 178; *House v. Montgomery*, 19 Mo. App. 170; *Fuhr v. Dean*, 26 Mo. 116; *Cook v. Pridgen*, 45 Ga. 331; *Campbell v. Railroad*, 110 Ind. 492; *Raritan Co. v. Vegt*, 21 N. J. Eq. 463, 475; *Ameriscoggan Bridge v. Bragg*, 11 N. H. 102; *Railroad v. McLanahan*, 59 Pa. St. 23; *Rhodes v. Otis*, 33 Ala. 578; *Wilson v. Chalpant*, 15 Ohio, 252; *Russell v. Hubbard*, 59 Ill. 335; *Thompson v. McElarney*, 82 Pa. St. 174; *Renick v. Kern*, 14 S. & R. 271; *Addison v. Hack*, 2 Gill, 223; *Hodgson v. Jeffries*, 52 Ind. 334.

*E. T. Farish* for respondents.

(1) Where it appears that the enjoyment of the right or the easement claimed, during any part of the time it is said to have been gained by user, was by permission of the owner of the land, the idea of its being adverse and as of right, and, therefore, an easement, is negatived. Washburn on Easements [3 Ed.] 40, 160; *Blacke v. Everette*, 1 Allen, 248; *Carbery v. Willis*, 7 Allen, 368; *Colvin v. Burnett*, 17 Wend. 568; *Parker v. Foot*, 19 Wend. 309; *Hammefin v. Blake*, 109 Mass. 297; *Portmore v. Bann*, 3 Dowl. & R. 145; *Crippen v. Moores*, 49 N. Y. 63; *Marshall v. Trumbell*, 28 Conn. 183; *McGregor v. Wait*, 10 Gray, 72; *Cleveland v. Way*, 97 Mass. 409; *Partridge v. Scott*, 3 M. & W. 320; *House v. Montgomery*, 19 Mo. App. 170. (2)

There is nothing in the evidence to indicate the asser-. tion of an independent or adverse right.

SHERWOOD, P. J.—The correctness of the view taken by the lower court is now to be examined.

The question first to be determined in this case is whether the use was really *adverse* to the owner, or was it merely permissive in its character. If permissive in its inception, then such permissive character being stamped on the use at the outset will continue of the same nature, and no adverse user can arise until a distinct and positive assertion of a right hostile to the owner, and brought home to him, can transform a subordinate and friendly holding into one of an opposite nature, and exclusive and independent in its character. *Budd v. Collins*, 69 Mo. 129; *Estes v. Long*, 71 Mo. 605; *Wilson v. Lerche*, 90 Mo. 473; *Wilkerson v. Thompson*, 82 Mo. 317. It is true that the cases just cited relate to adverse possession in the ordinary way; but the principle is the same in either case.

Though the statute of limitations has no reference to easements, yet, where a party has enjoyed an easement for such length of time as to confer title to land from the true owner to a disseizor, this adverse enjoyment will in law establish the right to the easement as against the owner of the serviente state. Wood on Nuisances, sec. 704; *House v. Montgomery*, 19 Mo. App. 170; *State v. Walters*, 69 Mo. 463; *State v. Wells*, 70 Mo. 635; *State v. Proctor*, 90 Mo. 334.

And such adverse user for the statutory period will give origin to the rebuttable legal presumption of a grant, even though the use in its inception was a trespass. Wood on Nuisances, secs. 704, 705.

The circumstances of this case already detailed conspicuously show that the use in this instance was not adverse, but merely permissive. And long-con-

tinued user is not sufficient in and of itself to establish an easement of the sort here claimed. To make the enjoyment of an easement adverse to the owner of the servient estate, the *intent* must exist to claim and enjoy the right adversely. In the absence of such intent and such claim, no adverse enjoyment will arise.

The right, in this case, then, must be regarded as merely permissive—in short, a *license*. Now, from its very nature, a license is revocable; but the authorities are divided as to whether a license is revocable after it has been executed, money expended, etc. Touching this point, an eminent author observes: "Some of the courts, indeed, deny the right of the (parol) licensor even to revoke the license, after outlay under it; resting the case on the ground of estoppel *in pais*, or treating the situation as equivalent to part performance of a parol *agreement* for the sale of an interest in real estate. But the better view, in presence of the statute of frauds, appears to be that, so far as the question of further enjoyment is concerned, the license may be revoked, though no action can be maintained against the licensee for what he has been induced or led to do. '*Volenti non fit injuria.*'" Bigelow on Estoppel [5 Ed.] 666–7.

And a distinction is taken by the authorities between acts done on the *licensor's* land, and those done on that of the *licensee*, the former being revocable, the latter not. Washburn·on Easement & Servitude [3 Ed.] 25, 679; 1 Washburn on Real Property [5 Ed.] 672.

The view of Bigelow as to what is the correct doctrine as to executed licenses, and as to their revocability evidently meets the approval of another text-writer of recognized authority, who touching this subject says: "Another class of cases where the license may be revoked is where the act·licensed to be

done is to be done upon the land of the licensor, and if granted by deed would amount to an easement therein. If such license be by parol, it may be revoked as to any act thereafter to be done, even though in order to enjoy it the licensee may have incurred expenses upon the premises of the licensor. Thus where A, by B's license, laid an aqueduct across B's land, who then revoked it, and cut off the pipe that conducted the water, the court, as a court of equity, refused to interfere, because B had a right to revoke the license at his pleasure. And in another case the licensee not only had laid an aqueduct, but dug a well to supply it upon the land of the licensor, and was without remedy, though the licensor cut it off. In another, the licensee, under a license to enter upon land, had expended money thereon and incurred expense on account of the same, and it was held revocable.

"The importance of the principle involved in the foregoing propositions in respect to the power of a licensor to revoke his license, even though the licensee, acting under such license, may have incurred expense for which he can claim no remuneration, seems to render a review of some of the cases, where the question has been raised, proper by way of illustration. In one class of these, the licensee at a considerable expense cut a drain in the licensor's land, by which the water of a spring flowed to his own land, and, after enjoying it some years, the licensor revoked the license and stopped it. The licensee was held to be without remedy. In another, the licensor gave the licensees permission to construct a culvert on their land, and thereby divert a current of water onto his land which they did at their own expense, and it was held to be revocable. In another, the license was to build a dam, or part of it, on the licensor's land, for the purpose of working a mill belonging to the licensee. And in another the

license was to flow the licensor's land for raising a head of water to work licensee's mill. And in both the licenses were held revocable, without remedy to the licensee for the expenses incurred. * * * In another class of cases the license has been to erect and maintain a house on the licensor's land, and, in some cases, the revocation has been before the building was completed, in others after it had been erected, and in both the builder was obliged to remove it without any right to claim compensation for loss." 1 Washburn on Real Property [5 Ed.] pp. 665–6, and cases cited.

The learned author then cites and quotes from adjudicated cases which hold a different view; but the rulings in those cases, as he shows, are evidently grounded on some earlier English cases, notably *Taylor v. Waters*, 7 Taunt. 384, the doctrine of which was exploded in *Wood v. Leadbitter*, 13 M. & W. 838, in an elaborate and able opinion by ALDERSON, B. The facts, on which the litigation was there based, were these: "The owner of land, on which was a stand for the spectators at a horse-race, sold a ticket to the plaintiff to enter and witness the race. Before the race was over, without any misconduct on the part of the plaintiff, or tendering him back the admission fee, the owner ordered him to leave the premises, and afterwards removed him; and it was held that his ticket was a mere license which was revocable."

In that case when illustrating his position, Baron ALDERSON said: "A mere license is revocable; but that which is called a license is often something more than a license; it often comprises or is connected with a grant, and then the party who has given it cannot in general revoke it, so as to defeat his grant, to which it was incident. * * * But where there is a license by parol, coupled with a parol grant, or pretended grant, of something which is incapable of being granted

otherwise than by deed, there the license is a mere license; it is not an incident to a *valid* grant, and it is, therefore, revocable. Thus, a license by A to hunt in his park, whether given by deed or by parol, is revocable; it merely renders the act of hunting lawful, which, without the license, would have been unlawful. If the license be   *   *   *   not only to hunt, but also to take away the deer when killed to his own use, this is in truth a grant of the deer, with a license annexed to come on the land; and, supposing the grant of the deer to be good, then the license would be irrevocable by the party who had given it; he would be estopped from defeating his own grant, or act in the nature of a grant. But suppose the case of a parol license to come on my lands, and there to make a watercourse to flow on the land of the licensee. In such a case there is no valid grant of the watercourse, and the license remains a mere license, and, therefore, capable of being revoked. On the other hand, if such a license were granted by deed, then the question would be on the construction of the deed, whether it amounted to a grant of the watercourse; and, if it did, then the license would be irrevocable."

In this state *Wood v. Leadbitter* has been cited approvingly in *Desloge v. Pearce*, 38 Mo. 599. In that case, acting under a parol license, one at great expense had entered upon the land of another and excavated the same for minerals, and had remained there thus mining for over ten years, when the owner revoked the license, and the licensee was held without remedy. It is not believed that the cases of *Fuhr v. Dean*, 26 Mo. 116, and *Baker v. Railroad*, 57 Mo. 265, intend to declare any different rule.

In the latter case there was something more than a mere parol *license;* it was a *contract* evidenced by a conveyance delivered *in escrow* to the agent of the

company granting the right of way, and to be delivered on compliance with its terms. "The doctrine of the revocability of licenses rests upon the familiar principle that a freehold interest in lands can only be created or conveyed by deed; and, as before stated, an easement in the land of another cannot be created, except by deed, or what is equivalent,—prescription." 1 Washburn on Real Property, 670.

In *Stock Yards v. Ferry Co.*, 112 Ill. 384, the very clear distinction is taken between a mere parol *license*, followed by expenditures and improvements, and a parol *contract* for the sale of the land followed by like improvements placed upon the land on the faith of the parol contract being performed; and the holding is there made that in the latter case equity could intervene on the ground of part performance, but not in the former case, where no such basis, to-wit, a *contract made*, was in existence. And in that case it was aptly said: "To say that the license is irrevocable, because the thing permitted to be done necessarily involved the expenditure of money, would be going beyond the most extreme views on the subject, and make most licenses irrevocable. The practical effect of such a doctrine would be to make most licenses conveyances of an interest in land by mere estoppel *in pais*.  *  *  * Such a decision would establish the rule that all licenses founded upon a valuable consideration, or necessarily involving the expenditure of money, would be irrevocable, which would practically destroy the distinction between a license and a grant."

In *Wolfe v. Frost*, 4 Sandf. Ch. 90, it was forcibly said: That, if the doctrine of the irrevocability of an executed license maintained in some jurisdictions is law, "a parol license, executed or acted upon, is sufficient to pass an incorporeal hereditament; thus not merely repealing the statute of frauds, but abolishing

the rule of the common law that such an estate can only be conveyed by a deed." See also *Jamieson v. Millemann*, 3 Duer, 255, and *Fargis v. Walton*, 107 N. Y. 398, and cases cited.

Guided by these authorities, it should be ruled that in the case at bar a mere parol license was given to the plaintiff, a license revocable at the pleasure of the licensor. But, if, on the other hand, the doctrine that an equity is created where, under a parol license, money has been expended and improvements made, and, therefore, the powers of a court of equity may be invoked, and specific performance decreed, the plaintiff, in this instance, must fail of obtaining such relief for the additional reason that the expenditures and labor were done without any *prior and distinct agreement, and without any consideration.* Parol agreements for the conveyance of land must not only be founded upon a valuable consideration, but the contract to be performed must be clearly defined by satisfactory testimony, and be accompanied by acts unequivocally referable to the alleged agreement. There are no such constituent elements to be found in this case. *Wiseman v. Lucksinger*, 84 N. Y. 31.

But one point remains to be discussed, and that is whether the plaintiff was entitled to any notice before the removal of his pipes. Under the authorities a reasonable time is allowed a licensee in which to enter on the land of his licensor, and to remove whatever structures or improvements he has placed thereon. And, even in the case of a *nuisance*, as where one builds a house where another has a right of common, it has been held that, before the latter could forcibly abate the nuisance, it was his duty to notify the wrongdoer to remove it. Where a nuisance is merely permitted to exist, and the case not urgent, notice and an opportunity for its removal are necessary, and

should be afforded to the party creating the same, before resort had to more extreme measures. Wade on Notice [2 Ed.] sec. 480*b*.

But none of those instances afford any illustration of the point in hand. Here there are no structures or improvements to remove, the sole question being whether without notice defendant could sever the connection between the sewer pipes on the land of plaintiff and those on the land of defendant, and we hold that she could, and that such removal was a revocation of the previously granted parol license. Therefore, judgment affirmed. All concur.