VALLIANT, J.
This is a suit in equity in which the plaintiff seeks to require each of the defendants to make an opening in its railroad embankment to permit a stream of water to flow in what the plaintiff alleges is its natural course. The petition states that the plaintiff is the owner of a certain section of land in Olay corinty, through the north half of which there are high bluffs extending east and west; that the lands to the north of the bluffs are high lands, and those to the south are river-bottom lands under cultivation and of great value for agriculture; that there are two branches, natural *493 water courses, Prather Branch and Eussell Branch, running down from the highlands to the foot of the bluffs on plaintiffs land, thence they.turned east, and until the erection of the obstruction complained of, flowed on in a natural channel and emptied their waters into Eock creek just east of plaintiff’s land; that of these two branches Eussell was west of Prather, and in its course to Eock creek when it reached the point where Prather came down into the bottom lands, the two streams united in one course and flowed together to Eock creek; that in 1890 a railroad corporation of this State known as the Chicago, Kansas City and Texas Bailroad Company acquired a right of way over that part of the land and in the construction of its road built an embankment across the course of those united streams, leaving no opening for their waters to flow through; that in 1894 the defendant the Kansas City and Atlantic Bailroad Company became the owner of that embankment and has ever since maintained the same and operated its railroad on it; that long prior to 1890 the defendant the Hannibal and St. Joseph Bailroad Company acquired a right of way on the land adjoining that now owned by the last named defendant and built its road on the same, but that prior to 1895 the Hannibal & St. Joseph railroad crossed Prather branch on a trestle leaving an open space beneath its tracks for the flow of the water down the channel; but in April, 1895, that company over the objections of plaintiff filled the space theretofore crossed by trestle with a solid embankment and has ever since maintained the same and operated its railroad thereon; that the embankments so made and maintained by the two defendants constitute parts of one and the same dam across Prather branch, and cause the waters thereof to flow back over the bottom lands of plaintiff rendering the same unfit for cultivation, injuring and destroying the crops growing thereon. The prayer of the petition is for a mandatory injunction to require the defendants to make openings *494 in their embankments sufficient to let the water flow through as they were accustomed to do.
The two defendants answer separately. The Kansas City and Atlantic Company avers that the railroad which it now owns is built on a right of way acquired by the Chicago, Kansas City and Texas Railway Company from one Nathan Harrelson who then owned the land, and that the railroad was built as he desired and requested; that the embankment now complained of was built where it is at the desire and request of said Nathan Harrelson, and openings, draws or culverts were placed where he requested, pursuant to a plan of drainage for these waters now complained of which he had designed before the construction of the railroad; that he well knew how the road was to be constructed, and how it was being constructed, and consented thereto, and that now he and his privies in blood and estate are estopped to complain of the manner in which the road is constructed. The answer also pleads that the road was built in July, 1889, and the plaintiff’s right of action is barred by the statute of .limitations
The answer of the Hannibal & St. Joseph Railroad Co., admits that long prior to 1890 it acquired the right of way and built its road on the land in question, first crossing Prather branch on trestle, and afterwards in April, 1895, filled that space with an embankment over which its railroad is now operated; then pleads that the Chicago, Kansas City and Texas Railroad Company constructed the road now owned by the Kansas City and Atlantic Railroad Co., in the manner as requested by Nathan Harrelson as pleaded in the answer of its codefendant, and that the embankment of that railroad forms a complete obstruction to the flow of the waters from Prather branch, if any there be in that direction at that point; that that embankment is 50 to 15 feet distant from the embankment* of this defendant, and the two in no sense constitute one obstruction; that if the Prather branch waters are caused to flow back over plaintiff’s lands it is so because of the *495 embankment of the other defendant and not that of this defendant. The answer also pleads that this defendant is misjoined as a party to this suit having nothing in common with the other defendant.
The reply was a general denial.
I. This cause and the cause of William H. Harrelson and Willis P. Williams against the same defendants, which was an action at law for damage for the same alleged wrong, were by agreement tried at the same time on the same evidence by the court, jury being waived. The finding and judgment were for the defendants in both cases, and after due proceedings the plaintiffs bring this cause here on appeal.
This is a case in which the chancellor had a better opportunity of arriving at the facts.than we have, at least he could do so with much more facility and confidence, for the reason that much of the evidence relates to the topography and physical conditions of the subject in dispute and these are illustrated by maps which are explained by the witnesses, but in their explanations the witnesses frequently indicated the points on the maps by touching them and designating them by the expressions “here” and “there,” which method was.clear enough to the chancellor but is not so clear when read from a transcript of the stenographer’s notes., However, with the three briefs of the respective counsel to assist in interpreting the evidence we have arrived at reasonably satisfactory conclusions as to the facts.
The plaintiff owns a section of land in Olay county lying a short -distance northeast of Kansas City. A line of bluffs runs across the section east and west dividing it so that the northern part is highlands and the southern part Missouri river bottom lands. There are two branches which rise in the highlands and come down to the foot of the bluff on plaintiff’s land. The one called Prather branch reaches the foot of the bluffs at a point about 400 feet west of what is called in the evidence the little trestle,which is the trestle formerly open on the Hannibal *496 road, now filled, and is 50 to 75 feet south of and parallel with the embankment complained of of the Kansas City and Atlantic Railroad Company, called in the briefs the Bates Company. The other, Russell branch, comes to the foot of the bluffs about 1,600 feet west of the point where Prather branch comes down. There was a great deal of evidence on the subject of these two branches, their respective volumes and courses. Prom this we conclude that they were natural streams running the greater part of the year, though dry at. some seasons, having well defined beds in the highlands and down to the foot of the bluffs, and Prather .branch when charged only with its natural flow and with the natural flow of Russell branch had a recognizable channel from the foot of the bluffs eastward to Rock creek into which it emptied. But whilst Russell branch was perhaps the larger of the two, its natural course, if it had one, after it reached the foot of the bluffs is not so easily located. This was from the fact that the occupants of the low lands, from a period as far back as . the evidence covers, undertook to direct its course by ditches and levees. But either by artificial means or by its natural inclination Russell branch when charged only with its natural water found its way into Prather branch and through it into Rock creek. These two branches when carrying what we have above designated as their natural flow, by which we mean branch water, were very inconsiderable streams,' and the beds they made for themselves in the alluvial lands whilst recognizable were barely so. But those branches were the conduits for the waters from the natural rain sheds in the hills through which they ran, and when there was a considerable rain fall the beds of those streams in the low lands were totally inadequate to carry the water and it spread out over the land, seeking the low places. Much of it went into lakes or ponds to the west of the point we are now considering.
• The date of the building of the Hannibal & St. Joseph Railroad is not given except to say that it was many years *497 before tbe construction, of tbe present object of tbe plaintiff’s complaint. It crossed Prather branch at this point on a trestle which offered no obstruction to the streams, and so continued up to the time when the Chicago, Kansas Oity and Texas Railroad, called in the briefs the Winner road, and now owned by the defendant, the Bates company, was built. The land now owned by plaintiff was then owned by his father Nathan E. Harrelson, the plaintiff deriving his title by inheritance from his father, and purchase from his brothers and sister of their inherited shares. -In February, 1889, Nathan E. Harrelson conveyed by deed to the Winner company the right of way on which that company built the road. The evidence shows that the deed was placed in escrow and for some cause not explained, presumably oversight, it remained in the hands of the custodian until his death some years later and came to light during the trial of this cause. Why it was put in escrow does not appear unless it be inferred from the circumstances. But it was in escrow while the road was being constructed and Mr. Harrelson, Sr., is shown to have taken a good deal of interest in the construction and its details.
As early as the summer of 1888 he and Mr. Winner went over the ground together and discussed the location and construction of the road with reference to the drainage of the waters coming down from the hills through these two branches; four or five times they met there together to discuss the subject and it was definitely agreed between them. The plan which Mr. Harrelson desired was to build an embankment across Prather branch where the embankment now is, and put in a trestle about 1,000 feet to the west nearly opposite the point where Russell branch reaches the low lands, and to bring the water from Prather branch by a ditch formed by the borrow pits to this trestle. The road was constructed on this plan, and seems to have been satisfactory to Mr. Harrelson, Sr., while he lived. The trestle thus made was over 200 feet long and nearly opposite what is called the big trestle *498 in the Hannibal and Wabasb railroads, which lie about 50 feet south and parallel with it. The point where Prather branch comes down to the lowlands is very little further from the trestle that was then built than it is from what is called the little trestle, with the advantage of being nearly opposite the point at which Eussell branch reaches the foot of the bluffs. And according to Mr. Hanson, an engineer who ran the levels upon the location of the road in 1889, the land was a foot .lower at the point where this trestle was put in than at the little trestle. This location of the trestle seems to have been agreeable to both the railroad company and Mr. Harrelson, Sr., conforming to the latter’s plan of drainage for his lands and enabling the former to put in the trestle where the track was straight, whereas according to the testimony of Mr. Winner if located opposite the Hannibal’s little trestle it would have to be curved, and a curved trestle 15 or 16 feet high, as that would have been, would be dangerous. However, the question of whether it was good or bad engineering is not for our decision. It was a subject the railroad company and the owner of the land had a right to regulate by contract and they seem to have done so. The consideration named in the deed was one dollar and an agreement to build a schedule station on the land, but that this drainage scheme of the elder Harrelson was also an important consideration to him is shown by the evidence and the circumstance of holding the deed in escrow, and we are satisfied that the road was built as he desired and as the parties agreed it should be.
But a plan for drainage of a large tract of land in the Missouri river bottom which is subject to overflow, though well designed and constructed is not in every instance permanent, at least this plan which worked well for several years is now unsatisfactory. The earth has filled up under the big trestle of the Hannibal, by natural deposits until the opening under it is inadequate and the level is there raised until the water by gravitation no longer seeks an outlet in that direction. But the storm water that comes on plaintiff’s land through *499 these branches would still drain through the trestle in the Kansas City and Atlantic road and turn east and pass out through the little trestle in the Hannibal road, as it did for a while, but for the fact that in April, 1895, the Hannibal company closed the trestle with an embapkment. The testimony on the part of that defendant is to the effect that it found that the currrent of water running in that way against its roadbed embankment made it dangerous for its traffic and for that reason it closed the little trestle.
II. The learned counsel for the plaintiff do not draw from the evidence the same conclusion as .to the facts that we have drawn as above stated. They see in the evidence nothing but the bare consent of Mr. Harrelson, Sr., to the construction of the embankment obstructing the natural flow of Prather branch and turning the waters back on his land and overflowing it; and from this they deduce the legal proposition that the consent amounted to á license to overflow his land, which license was revocable at his pleasure, and was revoked by his. death, also that it was personal to the licensee and ended when that licensee sold the road to the defendant, the present owner. And the learned counsel argue against the defendant’s right to maintain what they call the dam, as if it was an asserted right to an easement on plaintiff’s land, which they argue could be created only by deed.
The plaintiff’s counsel get the impression from Winner’s testimony that the agreement that he testifies to between himself for the railroad and Harrelson, Sr., was made after the embankment complained of was constructed. But that is a wrong impression. Winner’s testimony was to the effect that he was there four or five times with Harrelson, and that before the road was located or the deed drawn they agreed on this plan of drainage. The occasion referred by Winner in which he stated that the embankment was already built was when there was a change made in the county road, which was subsequent to the building of the embankment at that point.
*500 If the transactions between Winner and Harrelson, Sr., were only to the effect that the latter consented that the former might bnild a dam across the stream and overflow the land of the latter, and if there was no other controlling consideration in the case, the legal result would be as the counsel for plaintiff contend it is, that is, a mere license, revocable at the will of the licensor. [Washburn on Easements (3 Ed.), pp. 23, 24; Desloge v. Pearce, 38 Mo. 588 ; Pitzman v. Boyce, 111 Mo. 387 ; Dunham v. Joyce, 129 Mo. 5.]
. But Harrelson, Sr., never gave the railroad company a license to overflow his lands either for a year or a day. The company was seeking a right of way through his lands and negotiating with him for it, and he was negotiating with the company for the best protection he could obtain for his lands, that the road should be located and constructed where and in the manner that would be the least injury and the greatest advantage to him. And in that connection he requested that the • company locate a trestle 200 and more feet long at the point where it did so, and bring the Prather branch water down through it and thus as he hoped more effectually prevent an overflow of his lands. This he saw was done while the deed was yet held in escrow. Under those circumstances neither he nor those claiming under him have any standing in a court of equity to compel the railroad company to undo what he then •required that they should do, even though the natural elements have wrought such a change in the conditions as to make an undoing desirable.
III. The grant of a right of way to a railroad company implies that the grantor yields to the inconvenience and injury, if any, that necessarily will follow on the building, maintaining and operating the railroad through his land. [Benson v. Railroad, 78 Mo. 504.] The law will require the railroad company to make the inconvenience and injury as small as can be consistent with the reasonable exigencies of the common *501 carrier. This inconvenience and injury, taking as it often does the form of hindering drainage, is a matter to be considered by the commissioners or jury in assessing the landowner’s damages in a condemnation proceeding, or by the owner himself when he negotiates a sale of the right of way. [McCormick v. Railroad, 57 Mo. 433.] But when all that has been considered, and paid for, the company can not be enjoined from inflicting inconvenience or injury if it be such as necessarily results from a safe and conservative construction and operation of the railroad.
Section 2543, E. S. 1889, gives a railroad company the right to construct its road across a stream, not navigable by steamboats, but provides that the company shall restore the stream to its “former state, or to such a state as not unnecessarily to have impaired its usefulness.” That is but a statutory provision for what the law would have required without the statute. The railroad company has no right to inflict unnecessary injury in any case; but the law holds a railroad company to a very high degree of care in providing for the safety of its passengers, and it must exercise that degree of care for that purpose in the construction of its road, and if, in order to make its road safe, injury to adjoining property must be inflicted equity will not interfere to enjoin it.
Here is a roadbed 15 or 16 feet high, and the court is asked to require the railroad company to cut out the embankment at a point where' the road curves and to put in a trestle. Whilst there is not much evidence on the point yet the only evidence there is, is to the effect that it would be dangerous to the traffic to do so. The law which holds a railroad company to the highest degree of care for the safety of its passengers will not undertake to dictate to it the details of its road construction. .
IY. But even if we consider the agreement between Winner and Harrelson, Sr., as but a parol agreement to allow the railroad company to maintain a dam across a natural *502 stream and overflow Harrelson’s land, thereby creating a mere license revocable at the licensor’s pleasure, still the plaintiff’s right to equitable relief is not clear. This dam, if it is proper to call it so, was erected in 1889, certainly with the knowledge and consent, if nothing more, of the elder Harrelson. He lived until 1893, until he saw the little bed of Prather branch by disuse fill up and disappear from sight.
In 1894 the Bates company, the present owner, became the innocent purchaser, with nothing on the surface of the ground to indicate that there had ever been a bed of a stream there. If the elder Harrelson had regarded himself in the light of a mere licensor with power to revoke, he had no right to withhold the exercise of that power until the rights of an innocent third party intervened, and then have relief in a court of equity, where one who asks its peculiar relief must show not only a clear legal right, but also a case that appeals to good conscience, and show also that he has exercised reasonable diligence on his own part. [Landrum v. Bank, 63 Mo. 48 ; Schradski v. Albright, 93 Mo. 42.]
V. Whilst it is true as already said that one of these branches at least had, in its normal stage, a bed after it reached the bottom lands that was sufficient to carry off its branch water, yet that was a volume of comparatively small compass, and even if the natural course was obstructed it would have been a matter of light undertaking to have directed it in another course. But the water which has given the plaintiff the trouble he complains of, relief from which he seeks in this suit, is the rain water which is shed from those hills down upon the low lands. For that water there is no natural course, and although the railroad company would have no right to unnecessarily dam it up on the plaintiff’s land yet it had a reasonable discretion in providing for its outlet and was not bound to follow a particular course when nature had made none for it. [Hosher v. Railroad, 60 Mo. 329 ; Abbott v. Railroad, 83 Mo. 271.]
*503 The plaintiff now seeks to require the defendants to open their roadbeds at a particular point to let this flood of storm water go through, predicating his demand on the fact that at one time a small branch flowed naturally through the course. He is not entitled to it.
"VT. What is said above relates more particularly to the plaintiff’s complaint against the defendant, the Kansas City and Atlantic Eailroad Co. The other defendant, the Hannibal & St. Joseph E. E. Co., has some features of defense peculiar to itself. This company’s roadbed which is an embankment about twelve feet high lies just south of and parallel with that of its codefendant, and about 50 feet from it, so that after the flood from plaintiff’s land ceased going through the Hannibal big trestle, until this defendant in April, 1895, filled up the space at the little trestle, the embankments of the two railroads formed a walled passage fifty feet wide through which the waters from plaintiff’s land, coming through the long trestle in the Kansas City and Atlantic road, flowed east „ to the little trestle and out through it. The plaintiff’s own testimony seemed to indicate that if the Hannibal’s little trestle were left open now all his trouble would end, even if the embankment of the other defendant remained; for in that event the Prather branch water would take the course the plaintiff’s father and Winner designed it to take, to the extent at least of going through the big trestle that Winner built, then turning east it would escape as above indicated. But since, either on account of the river deposits under the Hannibal big trestle, or whatever the cause may be, the storm waters that came down from the bluffs on the plaintiff’s land and passed through the Winner trestle, no longer went out through the Hannibal big trestle, but turned east in the walled passage between the two roads seeking an outlet through the Hannibal little trestle. The Hannibal people discovered that this made a channel of running water along their embankment for a distance of about 1,000 feet which threatened to *504 undermine their roadbed, and under the advice of their engineers they closed the little trestle.
Whatever may be said of the plaintiff’s right to pass the waters of Prather branch ’ through its old natural channel across this defendant’s track, there can be no reasonable claim asserted of a right to wash its roadbed by a running stream of flood water for a distance of a 1,000 feet. Even if it were only the branch water of Prather branch, the utmost that the'plaintiff could ask on his own theory of the law would be to cross the defendant’s track in the natural channel; but when that channel has been obstructed, either with or without the plaintiff’s acquiescence or that of his ancestor, and the water has been diverted from its course, he has no right, to the injury of defendant, to bring it back for 1,000 feet along the base of defendant’s roadbed to find again the natural outlet. But as we have seen it is not the natural water of Prather branch alone with which plaintiff insists on washing the base of defendarft’s roadbed, but with all the rain that is shed by those hills on defendant’s bottom lands. There is no equity in the plaintiff’s demand.
YU. It is not the doctrine of equity jurisprudence in this State that a plaintiff can have no relief in equity against a continuing nuisance until he has obtained a judgment at law establishing the fact of the nuisance and his legal right. In a clear case a court of equity will grant relief, without waiting for the slow process of law. [Hayden v. Tucker, 37 Mo. 215 ; Carpenter v. Grisham, 59 Mo. 247 ; Turner v. Stewart, 78 Mo. 480.] But a court of equity will not interfere in a doubtful case until tbe plaintiff’s rights are established at law.
YIII. Our conclusion is there is no equity in the plain- ' tiff’s case and we perceive no error in the proceedings of the circuit court.
The judgment is affirmed.
All concitr.