Jack WALLACE, Plaintiff–Appellant,

v.

Jack SNIDER, Defendant–Respondent.

No. 27422.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 2, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 23, 2006.

Application for Transfer Denied
Nov. 21, 2006.

Paul F. Sherman, Mann, Walter, Bishop & Sherman, P.C., Springfield, for appellant.

John R. Lightner, J. Matthew Miller, Baird, Lightner, Millsap & Harpool, Springfield, for respondent.

JOHN E. PARRISH, Judge.

Jack Wallace (plaintiff) brought an action against Jack Snider (defendant) in

which he sought an injunction prohibiting defendant from denying him use of a roadway across property owned by defendant. Plaintiff sought a determination that he was entitled to use the roadway by reason of a provision in the warranty deed by which defendant acquired the real estate across which the road traverses (Count I) or, alternatively, that plaintiff had acquired a prescriptive easement to use the roadway (Count II).

Defendant filed a two-count counterclaim in which he sought damages for a breach of a contract he alleged had been entered into between the parties whereby they were to share the cost of constructing a fence on a boundary line to be established by a survey (Count I) and damages for trespass allegedly committed by plaintiff as a result of destruction done to a fence that was under construction in accordance with the agreement to which counterclaim Count I was directed (Count II).

The trial court entered judgment for defendant, denying plaintiff's request for an injunction. It entered judgment on Count I of defendant's counterclaim in favor of defendant in the amount of $1,395 and on Count II of the counterclaim "in the bond amount of $5,000.00" and directed payment of the bond amount to counsel for defendant.

Plaintiff appeals contending the trial court erred in finding he had not obtained an easement by prescription to use the road in controversy (Points I and II) and in finding that a contract existed that entitled defendant to relief for breach of contract asserted in Count I of defendant's counterclaim (Point III). This court affirms.

Defendant owns real estate in Christian County that adjoins T Highway. Plaintiff owns an 8.592–acre parcel of land that adjoins the west boundary of the northern part of defendant's land.

Dale Wallace, plaintiff's father, also owns real estate that adjoins defendant's property on its western side. Plaintiff's father's property lies southwesterly from plaintiff's property. Plaintiff's property and his father's property have a common corner. The corner is plaintiff's property's southwesterly corner and his father's property's northeasterly corner. Dale Wallace has owned his property since 1947. Plaintiff is "buying" the property from his father. He has farmed it, together with his parcel of land, for several years.

Defendant bought the property he presently owns from Glenn and Violet Cockroft in two transactions. He and his then wife, Villene, bought the 54.419 acres that adjoins T Highway in 1991. Villene subsequently conveyed her interest in the land to defendant. The warranty deed by which the Sniders acquired the 54.419–acre parcel provides that the land conveyed thereby is "[s]ubject to all public and private roads and easements including a 25 foot easement for ingress and egress across this property to the 80 acres which joins directly on the South end." Defendant later acquired the 80–acre tract referred to in the deed.

The road across the 54.419–acre tract runs from T Highway in a southwesterly direction to the southern boundary of that parcel. The road continues onto the 80–acre tract to which it provides the right of ingress and egress. It crosses the 80–acre tract to a location on its western boundary where it adjoins Dale Wallace's land. An access also exists from the southern boundary of the 54.419–acre parcel that crosses onto the 80–acre parcel and curves westerly and northerly to an entry point to plaintiff's 8.592–acre tract.

Dale Wallace owned the 80–acre tract that defendant presently owns from "September '47 up until ... April of [sic] 14th,

'82." When Mr. Wallace first bought the 80 acres, Cyrs Moody owned the 54.419–acre tract now owned by defendant. The 54.419–acre tract was later owned by Fred Heyn. Mr. Wallace was asked if he had permission from Cyrs and Heyn to cross the 54.419–acre tract to enter the 80 acres during the time they owned the property. He answered that he did.

Defendant purchased the 80–acre tract from the Cockrofts "a couple [of] years" after he bought the 54.419 acres. Defendant rented the 80 acres before he purchased it. It was serviced by the 25–foot road easement set forth in the deed by which defendant bought the first tract. Defendant presently owns both parcels of property.

Defendant was asked the following questions and gave the following answers:

Q. Did anybody ever use [the road that is the subject of this appeal] until someone came and asked you permission to use it?

A. No.

Q. Who came and asked you permission to use it?

A. Mr. Dale Wallace.

Q. And what did he say he wanted permission to do?

A. To haul his hay through there, through my property.

Q. Did he mention that sometimes he had other family members that would—that would be involved?

A. No, sir.

Q. Did he indicate that it would be specifically for use of that hayfield?

A. Yes.

Q. Did you give him permission?

A. Yes, I did.

Defendant said there came a time when the permission he had granted was being abused. He explained that plaintiff's son came over with a tractor and a four-wheel ATV a time or two. Defendant told the court, "And he cut a—cut the fence and made a little gap gate back on the south side of 9 acres, like he was—he was going to haul wood through there through—through my property back around, instead of going back out to—back through the 8 acres to the highway." Defendant told plaintiff he did not want him driving through his property with a wood truck or an ATV. The boy quit coming through defendant's property after that.

Dale Wallace was asked whether he sought permission to use the property defendant now owns from the people who owned the property before defendant acquired it. He said he had asked permission to use the property to get to his hayfield whenever ownership of the property defendant now owns changed. He was then asked, "You would ask each person who became owner of that property if it was all right for you to use that; is that right, sir?" He answered, "That's right." Mr. Wallace said that included defendant; that he had the same conversation with defendant shortly after defendant bought the property. Mr. Wallace said he had always been able to get permission for him and his family "to have access back there."

The evidence was that a dispute developed over construction of a fence on a surveyed property line that was at a different location than a previous fence line. Dale Wallace was asked, "So up until the time that there came to be a dispute over this building a new fence everybody that had owned [defendant's] property, including [defendant], from 1947 had always been asked and had always given permission to use that?" He answered, "That's right."

Shortly before the lawsuit that produced this appeal was filed, defendant and plaintiff discussed constructing a new fence.

Defendant was asked the following questions about what transpired and gave the following answers.

Q. . . . And did you and Jack agree, Jack Wallace, agree to construct a new fence?

A. Yes, he did.

Q. And was the agreement that it would be constructed along the survey line that Mackey Survey had set up?

A. Yes. We put it right on the survey line.

Q. What was the agreement as to who was going to pay for the fence?

A. We was going to pay 50/50.

Q. Did you buy the materials?

A. Yes.

Q. How—did you buy a bunch of posts?

A. Yes. I bought over 200 posts.

Q. Did you buy some corner posts?

A. Yes. About six or so corner posts.

Q. And did you buy—what, did you buy baling wire—or, I mean, barbed wire, or what?

A. Yes.

Q. How many rolls of barbed wire?

A. I bought eight, but there's only four of them used in the fence at the time it was torn down.

Q. About how much did you spend in materials?

A. Oh, probably over $600.

Defendant did the labor necessary to construct the fence. It took weeks to build the fence. When he had about half of it completed, with the wire up and all the posts placed around the rest of the property, plaintiff told him Dale Wallace did not like where it was; that they needed to hold up for a while. Defendant stopped the work. He was asked what happened next with respect to the fence. He answered:

Well, about a—probably a month or so after I was down at their house, he—he was down in the bottom working his road, down in the back side of their property. He was working the road a couple of Saturdays, I think. But then I went back again maybe two weeks later and the fence was completely missing.

Plaintiff denied that there was an agreement to split the cost of a fence around all the property. He said there was an agreement to split the cost of a fence around the part of the property that he owns, the 8.5 acres that lie north of the property that he is buying from his father; that he paid for a share of materials used to fence along the surveyed property line at that location. He said he tore down a fence that they had not agreed upon. Plaintiff said defendant "started a fence"; that he "told him not to." Plaintiff said he tore the fence down after giving notice to defendant for him to tear it down. About a month after plaintiff tore down the fence, a lock was placed on the gate that went from defendant's property to plaintiff's father's property. The gate that was locked was across the road plaintiff had used.

Plaintiff's first two points on appeal relate to the trial court finding that plaintiff had not acquired a prescriptive easement to use the road in question. Point I contends the trial court erred in finding plaintiff's use of the road was permissive at inception; that it was not adverse. Point II asserts trial court error in imposing the requirement that actual notice was required to the servient tenement as opposed to notice by ordinary inspection to reveal the road and servitude of the land over many years by the Wallace family.

An easement by prescription is established by use that is continuous, uninterrupted, visible and adverse for a period

of ten years. *Whittom v. Alexander–Richardson Partnership,* 916 S.W.2d 333, 335 (Mo.App.1995). Existence of an easement by prescription must be proven by clear and convincing evidence. *Harmon v. Hamilton,* 903 S.W.2d 610, 613 (Mo.App.1995).

*Schrieber v. Aslinger,* 11 S.W.3d 816, 819 (Mo.App.2000). "[L]ong-continued use alone will not create a prescriptive right." *Miller v. Berry,* 270 S.W.2d 666, 668 (Mo. App.1954). The use must be adverse, under a claim of right. *Id.*

> If permissive in its inception, then such permissive character, being stamped on the use at the outset, will continue of the same nature, and no adverse user can arise until a distinct and positive assertion of a right hostile to the owner, and brought home to him, can transform a subordinate and friendly holding into one of an opposite nature, and exclusive and independent in its character.

*Pitzman v. Boyce,* 111 Mo. 387, 19 S.W. 1104, 1105 (1892).

 The trial court made no specific finding regarding adverse use of the road in question by plaintiff or by those from whom he claims the right to use the road. Fact issues on which no specific findings are made are considered found in accordance with the result reached. Rule 73.01(c). Thus, the trial court is deemed to have found against plaintiff with respect to whether adverse use was shown as would be required to support a prescriptive easement.

Dale Wallace had always sought permission to use the road in question for purposes of accessing his property, the property plaintiff presently farms. He had always been able to get permission for him and his family to have access to that property. There was substantial evidence to support the trial court's determination that plaintiff did not acquire a prescriptive easement in that he did not show adverse use of the road in question. That determination was not against the substantial weight of the evidence. Points I and II are denied.

Point III is directed to the trial court finding for defendant on Count I of defendant's counterclaim; the claim that the parties had an agreement to build a fence on the surveyed boundary line and to share the expenses for building the fence equally. Plaintiff contends the trial court erred in finding for defendant; that there was no substantial evidence to support the judgment for defendant on that claim. He further contends that even if an agreement existed, it would not be enforceable because it is not in writing; that § 432.010 [1] would preclude its enforcement.

Appellate courts defer to trial courts on factual matters. *Lee v. Hiler,* 141 S.W.3d 517, 525 (Mo.App.2004). "A trial court may judge credibility and assign weight to evidence and testimony, and is free to believe none, part, or all of a witness's testimony." *Kester v. Kester,* 108 S.W.3d 213, 221 (Mo.App.2003).

 Defendant testified that there was an agreement and testified as to its terms. The trial court obviously believed that testimony. The testimony was substantial evidence in support of the decision the trial court reached. That decision was not against the weight of the evidence.

 Plaintiff also argues that if there was an agreement, it would not have been enforceable because it was not in writing; that § 432.010 requires an agreement to be in writing to be enforceable. That argument fails in that there was evidence that defendant partially performed the

---

1. References to statutes are to RSMo 2000.

agreement; that he constructed a significant part of the fence before its completion was interrupted by plaintiff.[2] "An oral contract is valid and enforceable, irrespective of the statute of frauds when there is proof of partial performance in furtherance of the agreement." *Shumate v. Dugan,* 934 S.W.2d 589, 592 (Mo.App.1996).

 Plaintiff further argues that the evidence was not sufficient to support the trial court finding that defendant was damaged in the sum of $1,395. Defendant testified that he expended $600 in materials and that it took weeks to construct the fence. In addition to out-of-pocket expenses, defendant was entitled to compensation for labor expended. Value of manual labor is a matter of common knowledge sufficient to permit the trial court to consider its worth in assessing damages. *See, e.g., Collins v. Trammell,* 911 S.W.2d 635, 638 (Mo.App.1995); *Hughes v. Estes,* 793 S.W.2d 206, 209–10 (Mo.App.1990). "Where the value of services is a matter of common knowledge, the trier of fact may determine value from its own knowledge...." *Matter of Estate of Enger,* 616 S.W.2d 137, 138 (Mo.App.1981). There was substantial evidence that supported the trial court's award. The award was not against the weight of the evidence. Point III is denied. The judgment is affirmed.

RAHMEYER, P.J., and McGHEE, Sp.J., concur.

---

**2.** Point III also complains that no agreement was reached as prescribed by § 272.060. § 272.060 does not afford plaintiff relief in that construction of the fence in question was not undertaken as a division fence as is permitted by that statute. The agreement reached was not between adjoining landowners in that plaintiff did not own the real estate that he contends was not intended to be fenced. Defendant did not seek to recover damages on the basis of § 272.060.