BRIDLE TRAIL ASSOCIATION, a Missouri Corporation, Plaintiff-Respondent,

v.

Frank O'SHANICK and Nancy H. O'Shanick, his wife, Defendants-Appellants.

No. 29314.

St. Louis Court of Appeals.

Missouri.

March 20, 1956.

Motion for Rehearing or to Transfer to Supreme Court Denied and Opinion Modified June 8, 1956.

Ziercher & Tzinberg, Erwin Tzinberg, Clayton, for appellants.

Jones, Hocker, Gladney & Grand and H. C. Gaebe, Jr., St. Louis, for respondent.

SAM C. BLAIR, Special Judge.

The plaintiff, Bridle Trail Association, maintains several miles of bridle trails in St. Louis County for the use of its members and their guests. The segment of the trails which concerns us runs from Clayton Road for several hundred feet south until it reaches a point on defendants' property near its northeast corner. Then it runs diagonally across the northeast corner of their property to its east boundary and enters the property of J. Gates Williams. The terrain the trail occupies in crossing defendants' property is a strip only 12 feet in width and 14.43 feet in length. In July 1954 they completely blocked all use of the strip by erecting a barricade at the point of its entrance and another at the point of its exit on their property. In the trial court the plaintiff was granted a mandatory injunction compelling defendants to remove these barricades and to refrain from interfering with plaintiff's use of the strip. The defendants appeal. Since only injunctive relief is sought by this action, this court has jurisdiction. Smith v. Santarelli, 355 Mo. 1047, 1048, 199 S.W.2d 411, 412; Judge v. Durham, Mo., 274 S.W.2d 247, 250; Burnett v. Sladek, Mo.App., 251 S.W.2d 397, 398.

Plaintiff pleaded a prescriptive right to use the strip, based on the claim, denied by

defendants, that it has used it as a part of its bridle trails in a manner that was open, visible, continuous and uninterrupted, adverse and under a claim of right, for more than the statutory 10-year period, V.A. M.S. § 516.010, prior to the erection of the barricades. On this appeal the crucial problem is whether plaintiff's use of the strip has been merely permissive or whether its use has been adverse and has ripened into a prescriptive right. There are other questions in the case, but a solution of this one will dispose of the appeal.

For the plaintiff, there was the following testimony relevant to the use of the strip. The Bridle Trail Association was organized and began functioning in 1924. Its membership has been held to approximately 25 members. Membership carried the privilege of riding on plaintiff's bridle trails. From 1924 until 1954, when the barricades were established, plaintiff's members, and their wives and children if they cared to do so, used the strip on defendants' property in riding from north to south and from south to north on this segment of the trails. From 1924 until 1940, the property on which the questioned strip lies was a vacant and unimproved lot. In the autumn of 1940, Louis A. and Betty Lou McMahon purchased the lot and built a house on it. In August of 1949, they sold the lot to Mrs. Elizabeth Mueller. In May of 1954, Mrs. Mueller sold the lot to Frank and Nancy O'Shanick, the defendants.-

Louis A. McMahon testified he bought the lot in the fall of 1940 and built a house on it. None of the Association's officials and none of the riders ever asked permission to use the strip. He merely permitted the use without raising any objection. The plaintiff made no assertion at any time of any right to use the strip. When the lot was sold to Mrs. Mueller in 1949, no reference to an easement was made in the deed and McMahon did not mention the subject to her. McMahon's wife, Betty Lou, testified that riders used the strip to cross the lot and that she raised no objection and gave no one permission at any time to use the strip.

Mrs. Elizabeth Mueller testified she purchased the lot from the McMahons in August 1949 and lived there until May 1954. She had a conversation with C. Virgil Christian, plaintiff's overseer of maintenance, about the use of the strip, and if Mr. Christian stated that she said it was all right for the Association to use the strip, "he would be right." She did not object to the use of the strip because *her* real estate agent told her when she bought the lot that there was "an easement for the bridle club." She did not tell Christian that she believed there was an easement and there is no evidence that she told anyone else or that anyone else told her there was an easement. The record does not anywhere disclose who her real estate agent was or why or with what authority he told her there was an easement across the lot. We do not regard his statement or her reliance on it as being of any evidentiary force. She had a conversation with Frank O'Shanick in which she told him she hoped he would never close the trail. She told both Mr. and Mrs. O'Shanick that she was "glad to see the horses were going through." She had another conversation with Mr. O'Shanick after the barricades were put in place. She said, "I see you have barricaded the trail." "Q. All right, what else did you say? A. He said, yes, he had." "Q. Anything else said at that time? A. I said it was too bad."

John F. Krey testified he had been a member of the Association since 1929 and had been one of its vice presidents since 1948. The Association held no written easement across the strip. The Association did hold written easements on other properties, but not this one. The witness had no discussions with prior owners of defendants' property regarding use of the strip. He said J. Gates Williams was "permitting" the Association to use his property. This is the property which the trail enters on the east immediately after crossing the strip on defendants' property.

Louis Werner, another vice president, testified he had been a member of the Association about 20 years and vice president

for "a year or two." He had no conversations with any owners of the property prior to its purchase by the defendants O'Shanick. After the barricades were established, he went to the defendants' home and had a conversation with Frank O'Shanick. He told O'Shanick that he was one who used the trail. The purpose of visiting O'Shanick was "I wanted to see if we couldn't get the barricade down." He asked O'Shanick to take it down, and he may have said, "and again give the trail permission to cross your property."

C. Virgil Christian testified he had been overseer of maintenance for plaintiff since 1947. He had no conversation with any owner of the strip prior to its purchase by Mrs. Mueller in 1949. In 1950 he talked with Mrs. Mueller several times. "I talked about horses, and about the trail there; and she seemed very satisfied that we were using it * * * and she did tell me we were welcome to pass over that portion of the trail." "That was when I became acquainted that that portion of the property belonged to her."

"Q. And did you ask Mrs. Mueller whether it was all right to go ahead and go over that part of the property? A. I did, yes, sir.

"Q. You asked her permission? A. I asked her if it was all right. * * * She stated that that portion of the property did belong to her and that we were welcome to ride through there."

"Q. At that time you didn't tell her you had a right to go over the property, did you? A. No, sir, I did not."

After the defendants purchased the property from Mrs. Mueller, the president of the Association told Christian, "Perhaps it would be a good idea if we became acquainted with the man (O'Shanick) and talked with him." Christian called on O'Shanick. He did not tell O'Shanick the Association had a right to use the strip. Discussing use of the trail with O'Shanick, Christian did offer to "go ahead and keep it clean and decent" and offered to give O'Shanick a load of manure. He denied that these offers were for permission to use the strip. He had previously called Mrs. O'Shanick and told her he would like to get acquainted with defendants "and talk about the trail." After the barricade was erected, Christian again talked to O'Shanick. "Q. Didn't you ask him if he wouldn't give you permission to cross the property? A. I believe I did ask him that, yes, sir."

Eugene F. Williams testified that he was president of the Association. He became its vice president when it was organized and he held that office until he became its president. At the date of trial, November 22, 1954, he had been its president for twelve years. The Association did not enter any agreement of any kind, written or oral, with the McMahons. The McMahons did not protest the use of the strip so "we presumed to use it." "Mrs. Mueller told Christian, and he told me, that she didn't object" to the Association using the strip. The property on the east and immediately adjacent to the tract the defendants now own belonged to J. Gates Williams, brother of the witness. J. Gates Williams "permitted" the Association "to go through there." The witness did not talk with the McMahons about using the strip, for "I thought the property" on which the strip lay "belonged to J. Gates Williams," that it was "part of the property which J. Gates Williams had given" the Association "permission to use." The Association had "no defined easement of any sort" on the Williams property. The witness did not learn that the strip was not a part of the Williams land until Mrs. Mueller sold her property to defendants in 1954. Although the witness actually believed the strip lay on the Williams property, he had no "actual knowledge" of the identity of the true owner.

For the defendants, there was the following testimony relevant to the nature of the use of the strip. Mrs. Nancy O'Shanick testified that Christian telephoned her prior to the date they moved into the house and told her he wanted to discuss the bridle trail crossing the property with Mr. O'Shanick and asked her if she "had any objec-

tion to the horses coming through." Frank O'Shanick testified he had a conversation with Christian about a week after he purchased the property. "He told me Mrs. Mueller had previously given permission for the bridle trail to cross the property and would we give them the same permission." "In return for the use of the trail Mr. Christian stated that they would police the area of droppings; that they would keep the grass cut; and he also told me he would give me a load of manure." Prior to their purchase of the property, Mrs. Mueller had pointed out the boundaries and asked O'Shanick if he liked horses and told him she had given the Association "permission" to use the strip. During the first week of June 1954, Mrs. Mueller remarked she was "glad we were still letting or permitting the horses to travel through the corner of the property because she liked horses." After the barricades were put in place, Mrs. Mueller said "it was too bad the barricades had to go up and we had stopped the horses." In July, at the O'Shanick home, he had a conversation with Louis Werner, one of plaintiff's vice presidents, after the barricades were put in place. Werner had telephoned him for an appointment, saying he was one of the officers of the Association. He said he was very sorry to learn that the trail had been barricaded and "was wondering what could be done in order to open the trail." Werner made some suggestion for letting the horses cross the strip which both he and O'Shanick finally agreed was not feasible. Werner's "parting remark was, 'I am sorry you are not letting us go through the trail.'" There is no evidence that either Werner or Christian asserted to defendants that plaintiff had the right to use the strip.

■ The method by which a prescriptive easement is acquired is analogous to the method by which title to real estate is gained by adverse possession. Roberts v. Quisenberry, 362 Mo. 404, 407, 242 S.W.2d 26, 29; Sanford v. Kern, 223 Mo. 616, 629, 122 S.W. 1051, 1056 [7]; Burnett v. Sladek, supra, 251 S.W.2d 399; Gibson v. Sharp, Mo.App., 277 S.W.2d 672, 678. The user asserted must not only have been open,

visible, continuous and uninterrupted for ten years or more, but it must also have been adverse and under a claim of right of which the owner of the property had actual or constructive notice. Kelsey v. City of Shrewsbury, 335 Mo. 79, 81, 71 S. W.2d 730, 731 [1]; Horton v. Gentry, 357 Mo. 694, 699, 210 S.W.2d 72, 75 [2]; George v. Crosno, Mo.App., 254 S.W.2d 30, 34–35 [6]. Mere use of a way over the land of another with his knowledge for the statutory period or longer is not necessarily an adverse use. For long continued use alone cannot ripen into a prescriptive easement. Anthony v. Kennard Bldg. Co., 188 Mo. 704, 720, 87 S.W. 921, 925; Pitzman v. Boyce, 111 Mo. 387, 392–393, 19 S.W. 1104, 1105; George v. Crosno, supra, 254 S.W.2d 34 [6]. And one who claims such an easement has the burden of establishing all of the essential requirements by clear and positive evidence. Crider v. Meatte, 320 Mo. 474, 485, 7 S.W.2d 691, 694 [12, 13]; Zinser v. Lucks, 361 Mo. 671, 235 S.W.2d 844, 848; Burnett v. Sladek, supra, 251 S.W.2d 399 [4–6]; Gibson v. Sharp, supra, 277 S.W.2d 678; 17 Am.Jur., Easements, § 73. Moreover, each claim of prescriptive easement must be determined on its particular facts and the tendency is to restrict the acquisition of such a right. Zinser v. Lucks, supra, 235 S.W.2d 848; Miller v. Berry, Mo.App., 270 S.W.2d 666, 670 [7, 8]; 28 C.J.S., Easements, § 18, pp. 663–664. Doubts as to the character of the use or the intention of the parties must be resolved in favor of the free and untrammeled use of the land. Anson v. Tietze, 354 Mo. 552, 562, 190 S.W.2d 193, 199 [13]; Marshall v. Callahan, Mo.App., 229 S.W.2d 730, 734 [4]; Gardner v. Maffitt, 335 Mo. 959, 965, 74 S.W.2d 604, 607 [5], 95 A.L.R. 452; Miller v. Berry, supra, 270 S.W.2d 671 [7, 8]; 39 C.J.S., Highways, § 23, p. 942; Thompson on Real Property, Vol. 1, § 436, p. 720.

■ For the sake of discussion, we will assume that plaintiff's evidence clearly and positively established that its user was open, visible, continuous and uninterrupted for the statutory period and longer. Plaintiff contends that we must presume, in these

circumstances, that its user was adverse and under a claim of right, for, it says, there was no proof that it was permissive. Our courts have announced the principle that open, visible, continuous and uninterrupted user for the statutory period creates a presumption, "in the absence of some showing" to the contrary, that the user was adverse rather than permissive, and casts the burden on the landowner to show that it was permissive, if he claims it to have been so. Anthony v. Kennard Bldg. Co., supra, 87 S.W. 924–926; Novinger v. Shoop, Mo., 201 S.W. 64, 67; Fassold v. Schamburg, 350 Mo. 464, 467, 166 S.W.2d 571, 572; Faulkner v. Hook, 300 Mo. 135, 142, 254 S.W. 48, 49; Burnett v. Sladek, supra, 251 S.W.2d 400; Robbins v. Anderson, Mo.App., 274 S.W.2d 809, 811; 17 Am. Jur., Easements, § 72. However, granting all deference to this presumption, it must be recognized that it does not rest on any fact basis of substantial probative value. It is *purely* an artificial one, a fiction of procedure whose office is to shift the burden of evidence, for reasons of judicial policy, from the claimant of an easement to the owner of the real estate. While it is true the presumption will stand and suffice the claimant if not rebutted by evidence in contradiction, it is just as true that it will lose all force and vanish when the facts appear in the evidence. And if the facts do appear, the existence or nonexistence of adverse user must be determined from those facts just as if no presumption had ever been operative. Kellogg v. Murphy, 349 Mo. 1165, 1180, 164 S.W.2d 285, 293 [8–10]; National Cylinder Gas Co. v. G. H. Packwood Mfg. Co., Mo.App., 208 S.W. 2d 825, 829; 12 Mo.Digest, Evidence, ▮▮ ▮▮ Thompson on Real Property, Vol. 1, Sec. 436.

Our question is whether application of the presumption of adverse user is justified by an absence from this record of any showing of permissive use. We think not. Our study convinces us that there is a showing that the user was permissive and not adverse and that it is present in plaintiff's own evidence. Eugene F. Williams, president of the Association, a member for 25 years,

and, from the day of its organization, always either vice president or president, testified he believed the strip in question lay on the property of J. Gates Williams and that he did not discover he was wrong until Mrs. Mueller sold her property to the defendants in 1954. The Association's use of the property of J. Gates Williams was by Williams' "permission". Obviously, the use of the strip by the Association, believing it belonged to Williams, was not made with any intent to claim any right either against Williams or its true owners. The Association's sole intent in using the strip was to avail itself of the "permission" Williams had given it to use his property. In these circumstances, there was no intent to use the strip adversely against the true owners, or anyone, and an intent to use adversely is the essence of adverse use. Sanford v. Kern, supra, 122 S.W. 1055; Jacobs v. Brewster, 354 Mo. 729, 736 [5], 190 S.W.2d 894, 898–899. The ruling in Brown v. Wilson, 348 Mo. 658, 666, 155 S.W.2d 176, 180, is cited by plaintiff as opposing our conclusion. But it holds only that "while one's occupancy of an adjoining proprietor's land under a mistake as to the boundary line, *and without any intention of claiming beyond the true boundary line,* when ascertained, is not adverse possession, yet if he takes and holds possession up to a given point, *and claims to be the true owner to such point,* his possession is adverse, notwithstanding his belief that such point is the true boundary line, when in fact it is not." The Association never claimed *ownership* of *any right* to use the strip, either against the true owners or J. Gates Williams. The ruling is of no relevance.

What we say does not overlook the testimony that defendants' predecessors in title, the McMahons and Mrs. Mueller, were aware of the use plaintiff was making of their property and raised no objection. On a different record this evidence could be of relevance. On this one it has none. For the use of the strip, whatever the knowledge and acquiescence of its owners, was not made under any claim of right to use their property. It was made solely with an intent to use the property of J. Gates Williams,

and that of no one else, and it was made only because plaintiff mistakenly believed it was using the Williams property under his permission to do so. This evidence cannot aid plaintiff.

■ Argument is made that Eugene F. Williams, in testifying, spoke only for himself, and as an individual, and that his belief could not bind the Association. On this record we do not consider this view of the effect and force of his testimony to be tenable. The Association, a corporation, could not speak for itself. At the time of the trial the witness was president of the Association and had been one of its officers since its organization. Plaintiff presented him as a witness on the affairs of the Association and he testified in detail regarding its purpose, its history, and its ownership of various easements on other properties and the use made of them. We think the witness was presented to speak for the Association and of its attitude regarding the use it made of the strip. Its misfortune is that he spoke as he did. We think this testimony of this witness, absent evidence to the contrary, and there was none, was binding on plaintiff whether that testimony was elicited from him on direct or cross-examination. Section 491.070 V.A.M.S.; State v. Roe, Mo., 180 S.W. 881, 885; State v. Murphy, 338 Mo. 291, 303, 90 S.W.2d 103, 109 [3]; Mississippi Valley Trust Co. v. Francis, Mo.App., 186 S.W.2d 39, 41 [2]; Draper v. Louisville & N. R. Co., 348 Mo. 886, 898, 156 S.W.2d 626, 633 [11, 12].

■ Added to this is other testimony. We are mindful that a request for permission to use the real estate of another does not serve to *revest* title already acquired by adverse possession or prescription. Sanderson v. McManus, Mo., 252 S.W.2d 351, 356 [3–6]. On the other hand, such a request, made even after the expiration of the period of limitation, has been characterized as "important," "strong," "very powerful" evidence tending to show that the prior possession was not adverse. 2 C.J.S., Adverse Possession, § 149c, notes 28, 29, p. 712; 2 C.J., § 141, note 26, p. 102; 28 C.J.S., Easements, § 13f, note 66, p. 651; 19 C.J., § 43(g), note 32, p.

884. Louis Werner, vice president, admitted he went to the home of the defendants in 1954 "to see if he couldn't get the barricade down." He requested defendant Frank O'Shanick to remove the barricade and admitted he may have said "and again give the trail permission to cross your property." Eugene F. Williams, president, directed Christian, overseer of maintenance, to get acquainted with defendant Frank O'Shanick and to talk with him. Obviously he was to talk with O'Shanick about the strip. That is what he talked about when he called on O'Shanick. He asked O'Shanick to give the Association "permission" to cross his property. Although he denied offering anything for the use of the strip, he admitted volunteering to keep it "clean and decent" and to give O'Shanick a load of manure. Previously, in 1950, he had talked with Mrs. Mueller after learning that she owned the property on which the strip lay. He had asked her "whether it was all right to go ahead and go over that part of the property." He did not tell Mrs. Mueller that the Association had a right to go across the strip and neither Werner nor he suggested to O'Shanick that the Association had such a right. Their silence on this subject on these occasions seems to us quite inconsistent with the attitude of men representing an association which was claiming that use of the strip was available to it *as a matter of right*. All of the testimony we have recited entered the record during the presentation of plaintiff's case and was given by witnesses for whose veracity plaintiff had vouched. Mississippi Valley Trust Co. v. Francis, supra, 186 S.W.2d 41 [2]; Draper v. Louisville & N. R. Co., supra, 156 S.W.2d 633 [11, 12].

In defendants' case there is more evidence of requests to use the strip and more silence about any *right* to use it. Christian called Nancy O'Shanick, according to her, and asked her if she "had any objection to the horses coming through." Frank O'Shanick said Christian telephoned him and told him Mrs. Mueller had previously given "permission" to the Association "to cross the property" and asked "would we give them the same permission." In return

for the use of the strip, he told O'Shanick the Association would "police the area of droppings;" that it would "keep the grass cut;" and give O'Shanick a load of manure. O'Shanick testified also that Werner, vice president, came to see him and asked him to take down the barriers. When he refused, Werner expressed only sorrow that "you are not letting us go through the trail." Neither Werner nor Christian told either defendant the Association had a right to use the strip.

Confronted by this evidence, we cannot rule that the presumption invoked by plaintiff is to be applied. "In civil cases we hold that a presumption is a rule of law (unless it is a conclusive presumption, i. e., a rule of substantive law) which puts the burden of producing *some substantial evidence* on the party presumed against; that when substantial evidence, *however slight*," appears, "the presumption disappears and the triers of fact receive the issue free from any presumption; * * *." State v. Martin, 364 Mo. 258, 260 S.W.2d 536, 541. In our opinion, the testimony recited amounts to some substantial evidence that the use of the strip was permissive and its presence in the record forbids application of the presumption invoked. State v. Gregory, 339 Mo. 133, 142–143, 96 S.W.2d 47, 52; Hardin v. Illinois Cent. R. Co., 334 Mo. 1169, 1180 [3], 70 S.W.2d 1075, 1079–1080; Cole v. Uhlmann Grain Co., 340 Mo. 277, 289, 100 S.W.2d 311, 317; Snowwhite v. Metropolitan Life Ins. Co., 344 Mo. 705, 714, 127 S.W.2d 718, 722. Our review of this record, and this ruling, leaves plaintiff, we think, with no substantial evidence of adverse user. We must hold that its failure to adduce some substantial evidence that its user was adverse was a failure to meet its burden of proof, and that its case must therefore fail. This cause must be reversed and remanded with directions to dismiss plaintiff's petition for want of equity. It is so ordered.

ANDERSON, P. J., and MATTHES, J., concur.