**IT IS HEREBY ORDERED** that defendant's motion for summary judgment [# 26] is granted.

**CUSTOM WAREHOUSE, INC., Plaintiff,**

v.

**Frederick G. LENERTZ, Sr., et al., Defendants.**

**No. 1:96CV197 FRB.**

United States District Court, E.D. Missouri, Southeastern Division.

Aug. 27, 1997.

Albert C. Lowes, Lowes and Drusch, Cape Girardeau, MO, for plaintiff.

Mark V. Bossi, Thompson Coburn, St. Louis, MO, Janel E. LaBoda, Scott G. Bowman, Briggs and Morgan, Minneapolis, MN, for defendant.

### MEMORANDUM AND ORDER

BUCKLES, United States Magistrate Judge.

Presently pending before the Court is defendants Frederick G. Lenertz, Sr. and FGL Holdings, Inc.'s Motion for Summary Judgment on All Claims and for Dismissal of the Claim for Reformation of Deed (filed July 8, 1997/Docket No. 49). All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

On October 17, 1996, plaintiff brought this action in the Circuit Court of Cape Girardeau, Missouri, alleging that defendant Frederick G. Lenertz, Sr. (Lenertz) owns property over which plaintiff is entitled to an easement by prescription, implication or necessity. Plaintiff further sought a declaration from the court as to the extent and parameters of such easements and to declare the location and condition of an easement for ingress and egress. On November 15, 1996,

Lenertz removed the cause to federal court invoking this Court's diversity jurisdiction inasmuch as there is diversity of citizenship and an amount in controversy in excess of $50,000.00. On March 6, 1997, plaintiff was granted leave to file an Amended Complaint naming FGL Holdings, Inc. (FGL), a Minnesota corporation solely owned by defendant Frederick Lenertz, claiming that FGL now owns the property over which the easements run.

Defendants Lenertz and FGL now move for summary judgment arguing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Plaintiff has responded to defendants' motion to which defendants have replied.

Pursuant to Rule 56(c), Federal Rules of Civil Procedure, a court may grant summary judgment if the information before the court shows that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The burden of proof is on the moving party to set forth the basis of its motion, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), and the court must view all facts and inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Once the moving party shows there are no material issues of fact in dispute, the burden shifts to the adverse party to set forth facts showing there is a genuine issue for trial. *Id.* The non-moving party may not rest upon its pleadings, but must come forward with affidavits or other admissible evidence to rebut the motion. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

Summary judgment is a harsh remedy and should not be granted unless the movant "has established his right to judgment with such clarity as to leave no room for controversy." *New England Mutual Life Ins. Co. v. Null*, 554 F.2d 896, 901 (8th Cir.1977). The Eighth Circuit has noted, however, that "summary judgment can be a tool of great

utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273 (8th Cir.1988).

## I. Statement of Undisputed Facts

In 1985, brothers Frederick and Lawrence Lenertz purchased over twenty-one acres of property as tenants in common from various members of the Howard family: Tract A–1, consisting of 16.7 acres, was conveyed to Frederick and Lawrence from Mary, Vince and Vernice Howard on September 16, 1985; Tract A–2, consisting of 1.12 acres, was conveyed to Frederick and Lawrence from Mary Howard on September 23, 1985; and Tract A–3, consisting of approximately 3.9 acres, was conveyed to the brothers from Mary Howard on November 29, 1985. At the time of the purchases, the property was undeveloped farmland with a creek running through it. Highway 177 abutted the southernmost length of the property; a county road abutted the easternmost length of the property. (Blomquist Affid. Exh. A; Lenertz Affid. at 1–2 & Exh. A.)

Thereafter, approximately twelve acres of the Lenertz-acquired property was graded and surfaced with gravel. The purpose of this graveled lot was to act as a secured "Drop Lot" for semi-trailer trucks picking up and dropping off trailers in relation to loads carried for a nearby Proctor & Gamble manufacturing plant. For security purposes, the Lenertz brothers arranged for the installation of fencing and lighting around the Drop Lot, and a guard shack was placed at the entrance to the Drop Lot from Highway 177. (Lenertz Affid. at 1–2.) A guard is posted at the Lot's entrance twenty-four hours a day, and no person is permitted to enter the Drop Lot without authorization from the guard. The Drop Lot began operations in late–1985. (Lenertz Affid. at 2.)

On November 29, 1985, Frederick Lenertz purchased from Mary Howard approximately 7.19 acres in property which was located north of the Drop Lot property (Tract B–1). On December 3, 1985, Frederick Lenertz purchased his brother Lawrence's interest in the northwest portion of the Drop Lot property and thus owned this portion of the Drop Lot property in fee (Tract B–3). On May 8, 1986, Frederick Lenertz purchased from Mary Howard approximately 20.59 acres in property (Tract B–2) which adjoined the southwestern border of the Drop Lot property and a portion of the northwestern border of the Drop Lot. The property also extended northwest of the Drop Lot property and adjoined the southwestern border of Tract B–1 A county road abutted the easternmost length of all the property acquired. (Blomquist Affid. Exh. B; Lenertz Affid. at 2–3 & Exh. B.)

In May 1986, grading began on Frederick Lenertz' Tract B properties for the purpose of erecting warehouses for use in conjunction with the Proctor & Gamble manufacturing plant. (Penzel Depo. at 52; Lenertz Affid. at 3.) On July 14, 1986, a joint venture group (JV–1) was formed to acquire property owned by Frederick Lenertz north of the Drop Lot and to build a warehouse for such use. (Lenertz Affid. at 3.) Frederick Lenertz held a forty-percent interest in JV–1; Carl Gene Penzel, Gary Stanley, Carl L. Penzel, and Richard L. Kies each held fifteen-percent interests in the group. (Lenertz Affid. Exh. C–1.) On July 21, 1986, JV–1 purchased approximately 13.65 acres in property, north of the Drop Lot, from Frederick Lenertz and his wife. (Lenertz Affid. Exh. C–3.) A county road abutted the easternmost length of the property. (Blomquist Affid. Exh. C.) On July 29, 1986, Frederick, his wife and Lawrence Lenertz granted a thirty-foot easement to JV–1 providing access to Highway 177 across land immediately southeast of and contiguous with the JV–1 property and across the southwest portion of the Drop Lot (hereinafter referred to as the 30–foot easement). Lawrence reluctantly agreed to the establishment of the easement. Thereafter, JV–1 obtained a loan from Jackson Exchange Bank secured by a deed of trust. (Lenertz Affid. at 3 & Exh. C–4.) Frederick Lenertz entered into a lease for the property and any accompanying warehouse with the option to purchase after five and ten years. (Lenertz Affid. Exh. C–2.)

Another joint venture group was formed (JV–2) to acquire property south of the JV–1

property and to build an additional warehouse. (Lenertz Affid. at 3–4.) Frederick Lenertz held a forty-percent interest in JV–2; Carl Gene Penzel, Lester A. Maevers, Carl L. Penzel, and Leo Kohlfeld each held fifteen-percent interests in the group. (Lenertz Affid. Exh. D–1.) On September 27, 1986, JV–2 purchased approximately 14.7 acres in property, north of the Drop Lot and south of the JV–1 property, from Frederick Lenertz and his wife (Tract D–3). (Lenertz Affid. Exh. D–3.) On that same date, JV–2 purchased approximately 2.06 acres in property, north of the Drop Lot and south of Tract D–3, from Frederick Lenertz, his wife and Lawrence Lenertz (Tract D–4). (Lenertz Affid. Exh. D–4.) A county road abutted the easternmost length of all the property acquired. (Blomquist Affid. Exh. D.) On September 29, 1986, Frederick, his wife and Lawrence Lenertz, along with JV–1 and JV–2, executed a Joint and Mutual Easement Agreement whereby, *inter alia*, a forty-foot easement was established to provide JV–1 and JV–2 access to Highway 177 along the westernmost border of the Drop Lot property (hereinafter referred to as to the 40-foot easement).[1] On that same date, JV–2 obtained a loan from Jackson Exchange Bank secured by a deed of trust. (Lenertz Affid. at 4–5.) Frederick Lenertz entered into a lease for the property and any accompanying warehouse with the option to purchase after five and ten years. (Lenertz Affid. Exh. D–2.)

The JV–1 warehouse was substantially completed and began operations on November 11, 1986. (Lenertz Affid. at 5.) The JV–2 warehouse was substantially completed on December 31, 1986, and began operations in January 1987. (Lenertz Affid. at 5; Penzel Depo. at 41.) The first use of any warehouse for loading and/or unloading trucks occurred not earlier than November 1986. (Beard Affid.) The warehouses were constructed such that semi-trucks with tractor-trailers would travel counterclockwise around the warehouses, beginning at the southeast corner of the JV–2 warehouse, northwesterly around the JV–1 warehouse, then southeasterly along the JV–1 and JV–2 warehouses, and exiting at the southwest corner of the JV–2 warehouse. (Blomquist Affid. Exh. E; Luttrull Affid. at 2.) Semi-trailer trucks needing access to the warehouse properties would enter at the southwest corner of the Drop Lot, pass the guard shack, and drive northward toward the southeast corner of the warehouses. (Lenertz Affid. at 5; Beard Affid. at 2; Lipps Affid. at 2.) There were no defined paths or parking spaces on the Drop Lot, and paths taken by drivers to the warehouse properties varied according to the parking patterns of the trailers. (Lenertz Affid. at 5; Luttrull Affid. at 1–2; Thompson Affid. at 1–2; Beard Affid. at 2.) On many occasions, tractor-trailers were parked on the 40-foot easement, thus blocking any attempted travel along that easement. (Thompson Affid. at 2; Penzel Affid. at 2.)

In May 1992, the Jackson Exchange Bank was declared insolvent and a Receiver was appointed by the FDIC. (Penzel Depo. at 49.) The JV–2 loan subsequently went into default and in May 1994, the FDIC purchased the JV–2 property at a foreclosure sale. (Lenertz Affid. at 6; Penzel Depo. at 47–48; Champagne Depo. at 37–38 & Exh. 3.) The JV–1 loan subsequently went into default and in July 1995, the FDIC purchased the JV–1 property at a foreclosure sale. (Lenertz Affid. at 6; Champagne Depo. at 38–39 & Exh. 4.) Frederick Lenertz conducted warehouse operations through August 1995. (Lenertz Affid. at 6.)

The FDIC scheduled an auction for the warehouse properties for October 1995. (Champagne Depo. at 76–77.) The JV–1 property was appraised at approximately $2,000,000.00. (Champagne Depo. at 126.) The JV–2 property was appraised at a value of $2,075,003.00. (Job Depo. at 20–31 & Exh. 2 at 0059; Champagne Depo. at 52.) This value included a downward adjustment of $125,000.30 for "[c]onstruction of a roadway on the easement providing legal access." (Job Depo. at 28–29 & Exh. 2; Champagne

---

1. The 40-foot easement is positioned along the westernmost border of the Drop Lot property, begins at Highway 177 to the west of the guard shack, traverses northwest along said border, and ends at the northwestern border of the property near the southwest corner of the warehouse on the JV–2 property.

Depo. at 52.) The Purchase Agreement for the properties advised prospective buyers that the property was being sold "as is," "where is" and "with all faults." (Irvan Depo. at 31–33 & Exh. E.) In addition, the FDIC disclaimed any and all implied warranties as to the condition of the property and any portions thereof. The survey of the properties provided to prospective buyers showed only the 40–foot easement. (Irvan Depo. Exh. E.)

Jerry Lipps, President of Custom Warehouses, Inc. (CWI), the plaintiff here, registered for the sale of the properties and obtained an information packet which contained, *inter alia,* the Purchase Agreement, auction information, and a survey of the properties. (Lipps Depo. at 49–52; Irvan Depo. at 20, 31–33 & Exh. E.) Lipps and Ivan Irvan, a local realtor, inspected the properties and noted the 40–foot easement located on the Lenertz brothers' property to be unimproved. Specifically, it was noted that the easement was located along the westernmost border of the Drop Lot property; that a portion of the easement was on the graded surface of the Drop Lot; and that a portion of the easement was on a sloping hillside adjacent to the graded surface of the Drop Lot. (Lipps Depo. at 69–70; Irvan Depo. at 41–44.) Most of the easement was located on the gravel Drop Lot, however, and tractor-trailers were able to position their trucks on the easement. (Lipps Depo. at 69–70.) Lipps, who owns a construction company, estimated that the easement could be improved and made usable for $5,000.00. (Lipps Depo. at 42, 99.)

Lipps bid $2,300,000.00 for the JV–1 and JV–2 properties at the auction. (Lipps Depo. at 63.) Although this was the highest bid received, the FDIC did not sell the properties at that time inasmuch as the bid did not meet or exceed the minimum reserve price sought at the auction. (Lipps Depo. at 64–65; Champagne Depo. at 86; Irvan Depo. Exh. E.) Thereafter, the FDIC reviewed its appraisals in an effort to meet Lipps' bid and considered the easement problems when determining whether to reduce the price sought for the warehouse properties. (Champagne Depo. at 87–88; Lipps Depo. at 72–73; Irvan

Depo. at 37.) In addition, the FDIC made efforts to obtain a new easement from the Lenertz brothers to provide access to the warehouses, across the Drop Lot. (Lenertz Affid. at 6; Champagne Depo. at 91, 93–94, 100, 104, 108–11 & Exh. 7B.) Although an agreement was never reached as to a new easement, the brothers permitted FDIC to access the warehouses by using portions of the Drop Lot other than the 40–foot easement. (Lenertz Affid. at 6; Champagne Depo. at 96.)

In February 1996, the FDIC reduced the list price for the warehouse properties from $4,625,000.00 to $3,135,000.00 (Hyman Depo. at 22, 26–27 & Exhs. 3, 5.) Thereafter, Lipps offered $2,600,000.00 for the properties, and the FDIC accepted the offer. (Lipps Depo. at 89.) The transaction closed for the purchase price of $2,600,000.00. (Lipps Depo. at 93 & Exh. K.) Lipps subsequently transferred the properties to CWI. (Lipps Depo. at 28 & Exh. C.)

On August 1, 1996, Lawrence Lenertz and his wife transferred their entire interest in the Drop Lot property to Frederick Lenertz. (Lenertz Affid. at 6 & Exh. G.) On October 22, 1996, Frederick Lenertz transferred his interest in the Drop Lot property to FGL Holdings, Inc., for business purposes. (Lenertz Affid. at 6–7 & Exh. H.)

Lipps made efforts to obtain a new easement from Frederick Lenertz to provide access to the warehouses across the Drop Lot. Frederick offered to provide such an easement for $400,000.00, however Lipps rejected the offer. During the course of these discussions, Frederick permitted Lipps to access the warehouses by using portions of the Drop Lot other than the 40–foot easement. An agreement to create a new easement was never reached. (Lenertz Affid. at 6.)

Drivers are unable to navigate their semi-trailer trucks on the county road which abuts the warehouse properties such that they are able to obtain access to the properties. (Beard Affid. at 3; Lipps Affid. at 4; Luttrull Affid. at 2; Penzell Affid. at 3.)

## II. Discussion

Plaintiff CWI claims that it is entitled to an easement by prescription, implication or

necessity across the Drop Lot so that tractor-trailers may enter the warehouse properties at the southeastern corner and traverse the warehouses in a counter-clockwise fashion as intended and by which the warehouses were constructed. Plaintiff claims that the current 40–foot easement is insufficient for the reason that it travels only to the southwestern corner of the warehouses; that tractor-trailers are unable to negotiate a right-hand turn from the easement onto the warehouse properties in a manner consistent with the intended use of the warehouses; and that tractor-trailers are unable to negotiate a subsequent left-hand turn necessary to traverse the northeasterly side of the warehouses.

## A. Easement by Prescription

■ To show the creation of a prescriptive easement, plaintiff must demonstrate by clear and convincing evidence that, for a period of ten years, the use of the disputed property was 1) continuous and uninterrupted; 2) adverse; 3) under a claim of right; and 4) with notice to the owner of the use and the claim of right. *Homan v. Hutchison,* 817 S.W.2d 944, 947 (Mo.Ct.App.1991). The requisite ten-year period may be created by the "tacking together" of successive owners' periods of continuous, uninterrupted and adverse use, "each of which may be less than ten years but with their total amounting to ten years or more." *Id.* (citing *Johnston v. Bates,* 778 S.W.2d 357, 361 (Mo.Ct.App. 1989)). "A use is not deemed to be adverse where the user recognizes the authority of those against whom the use is claimed to prevent or prohibit the use." *Id.* (citing *Hodges v. Lambeth,* 731 S.W.2d 880, 882 (Mo.Ct.App.1987)).

■ A permissive use cannot ripen into a prescriptive use. *Homan,* 817 S.W.2d at 948 (citing *Johnston,* 778 S.W.2d at 362). A use which is permissive in origin remains permissive until a right hostile to the owner is distinctively and positively asserted and made known to him. *Id.* (citing *Fassold v. Schamburg,* 350 Mo. 464, 166 S.W.2d 571, 572 (1942)). "Long and continued use alone will not ripen into a prescriptive easement." *Id.* (citing *Bridle Trail Association v. O'Shanick,* 290 S.W.2d 401, 405 (Mo.Ct.App.1956)). In

addition, the location of the disputed property cannot be based merely on speculation and conjecture. *Id.* Rather, as in a case of adverse possession, "the exact location of the disputed lands with precise, ascertainable and recognizable boundaries is necessary, lest a judgment be rendered void as based on speculation and conjecture." *Homan,* 817 S.W.2d at 948 (citing *Green v. Lange,* 797 S.W.2d 765, 769 (Mo.Ct.App.1990)).

■ Based on the evidence in the instant cause, plaintiff cannot demonstrate by clear and convincing evidence that a prescriptive easement has been created across the Drop Lot. First, there is no evidence before the Court that the way sought across the Drop Lot had been used continuously for the prescriptive period of ten years prior to the filing of this lawsuit. *See, e.g., Heigert v. Londell Manor, Inc.,* 834 S.W.2d 858, 863 (Mo.Ct. App.1992) (adverse period must run for at least ten years prior to time initial petition filed). Plaintiff filed the instant cause of action on October 17, 1996. Therefore, the adverse period must be at least ten years prior to that date. *Id.* However, operations did not begin at the warehouses until November 1986 and tractor-trailer trucks did not begin to use the warehouses until that time. Prior to November 1986, the properties were under construction. Although plaintiff claims that a ramp was built at the southeast corner of the JV–2 property in August 1986 and that such construction demonstrates an intent that a way be established across the Drop Lot to the southeast corner of the warehouse, such construction of a ramp nevertheless does not demonstrate by clear and convincing evidence that a way across the Drop Lot was actually used continuously on or before October 17, 1986.

Assuming arguendo that a way across the Drop Lot had been used continuously for the prescriptive period, the evidence before the Court shows that such use was not adverse. A use is not deemed to be adverse where the user recognizes the authority of the property owner to prevent or prohibit the use. *Whittom v. Alexander–Richardson Partnership,* 851 S.W.2d 504, 508 (Mo. banc 1993); *Homan,* 817 S.W.2d at 947. In the instant cause, it is undisputed that from at least

November 1986 through at least May 1994, JV–1 and JV–2 owned the warehouse properties and that during that period of time, Frederick Lenertz leased and operated the warehouses. In addition, Frederick held an ownership interest in and controlled the operations of the Drop Lot. No person was permitted to enter the Drop Lot without authorization from the guard. Thus, any use of the Drop Lot to access the warehouses during this period was permissive in nature and not without recognition of the Lenertz' authority to prevent or prohibit such use. *See, e.g., Homan,* 817 S.W.2d at 947. In addition, the undisputed evidence shows that the Lenertz' granted permission to the FDIC and to plaintiff CWI to cross the Drop Lot by a way other than the 40–foot easement. Permissive use cannot ripen into prescriptive use. *Id.* at 948. Any use which is permissive in origin remains permissive until a right hostile to the landowner is distinctively and positively asserted and made known to him. *Id.* There is no evidence before the Court to show that such a hostile right was asserted against Lenertz until the filing of the instant lawsuit. As such, any prior use of the Drop Lot to gain access to the warehouse properties cannot be said to be adverse.

 Finally, evidence before the Court shows that paths taken from the southwest corner of the Drop Lot northward to the southeast corner of the warehouses varied. No specific and defined path existed to access the southeast corner of the warehouse. "An overriding requirement for establishing a prescriptive easement is '[e]vidence which will enable the easement to be located....'" *Wells v. Carpenter,* 916 S.W.2d 405, 407 (Mo. Ct.App.1996) (quoting *Dillon v. Norfleet,* 813 S.W.2d 31, 32 (Mo.Ct.App.1991)). *See also Homan,* 817 S.W.2d at 948. Although plaintiff submits evidence that the "preferred" easement sought is a way used by tractor-trailers by which they "leave the guard house and veer on a smooth turn to the right and traverse in an easterly direction and then northerly ...," (Dowdy Affid. Attchmnt.), there is no evidence demonstrating that a specific and defined path is used or has been used for the prescriptive period. "Measuring the easement one wants is not the same as measuring and proving the existence and location of a path used continuously for ten years in the same location." *Wells,* 916 S.W.2d at 408.

Therefore, defendants should be granted judgment as a matter of law as to plaintiff CWI's claim that it is entitled to a prescriptive easement across the Drop Lot so that tractor-trailers may directly access the southeast corner of plaintiff's warehouses.

### B. *Easement by Implication*

 Plaintiff also argues that it is entitled to an easement across the Drop Lot by way of implication. An implied easement arises when a landowner conveys part of his land to another, *Gerken v. Epps,* 783 S.W.2d 157, 160 (Mo.Ct.App.1990), and a way used across the land prior to severance of the estate was so open and obvious that the way was intended to be permanent and run with the land. *See generally Causey v. Williams,* 398 S.W.2d 190 (Mo.Ct.App.1965).

> It is a well-settled rule that where, during the unity of title, an apparently permanent and obvious servitude is imposed on one part of an estate in favor of another part, which servitude at the time of the severance, is in use and is reasonably necessary for the fair enjoyment of the other part of the estate, then upon a severance of the ownership, a grant of the right to continue such use arises by implication of law.

*Peterson v. Medlock,* 884 S.W.2d 679, 684 (Mo.Ct.App.1994) (quoting *Causey,* 398 S.W.2d at 197) (internal quotation marks and citations omitted).

 Therefore, to demonstrate an easement by implication, the plaintiff here must show: 1) unity of title followed by a separation of title of the subject property into dominant and servient estates; 2) the existence of the purported easement as an open, obvious and visible benefit or advantage to the plaintiff's property and a burden to the servient portion of the premises; 3) use of the purported easement long enough before the separation of title and under such circumstances so as to show that the alteration or artificial arrangement was intended to be permanent; and 4) reasonable necessity of the purported

easement for the full beneficial use and enjoyment of the dominant estate. *Full Gospel Fellowship v. Stockwell,* 938 S.W.2d 677, 678 (Mo.Ct.App.1997); *Hillside Dev. Co., Inc. v. Fields,* 928 S.W.2d 886, 889 (Mo.Ct.App. 1996); *Peterson,* 884 S.W.2d at 683–84; *Causey,* 398 S.W.2d at 197. An implied easement necessarily arises at the time of severance by the common owner. *Hillside,* 928 S.W.2d at 890.

The requisite unity of title has not been demonstrated in this cause. Evidence before the Court shows that the tracts of land which now comprise the Drop Lot property and the warehouse property were never owned by a common owner. The Drop Lot property is comprised of tracts of land which were owned by Mary Howard and a separate tract of land which was owned by Mary, Vince and Vernice Howard. These tracts of land were conveyed to Frederick and Lawrence Lenertz as tenants in common. The warehouse property is comprised of tracts of land which were purchased from Mary Howard by Frederick Lenertz. Subsequent to this purchase from Mary Howard, Frederick conveyed a portion of his solely-owned property to JV–1. Thereafter, JV–2 purchased property from Frederick Lenertz and a portion of the property owned by Frederick and Lawrence as tenants in common. Warehouses were subsequently constructed on the JV–1 and JV–2 properties. Frederick owned a partial interest in both JV–1 and JV–2. After foreclosure and purchase by the FDIC, plaintiff CWI purchased the warehouse property. Frederick thereafter purchased Lawrence's interest in the Drop Lot property and transferred all interest in the property to FGL Holdings, Inc.

As summarized above, the evidence shows that there was never common ownership over the Drop Lot and warehouse properties at issue in this cause. Indeed, the entire tract of land was never owned by a common owner as a single parcel of property. As such, plaintiff's claim of easement by implication fails as a matter of law. Although at one time Frederick owned a partial interest in all of the properties at issue, the other ownership interests in the properties were dissimilar and thus unity of title was lacking. *See,*

*e.g., Gerken,* 783 S.W.2d at 162 ("obvious" that party did not own both tracts of land where he owned only partial interest in one tract).

Plaintiff argues, however, that unity of title is demonstrated inasmuch as Frederick Lenertz controlled both the Drop Lot and warehouse properties, and cites *Bays v. Haven,* 55 Wash.App. 324, 777 P.2d 562 (1989); *Malerba v. Warren,* 96 A.D.2d 529, 464 N.Y.S.2d 835 (N.Y.App.Div.1983); and *Cosmopolitan Nat'l Bank of Chicago v. Chicago Title & Trust Co.,* 7 Ill.2d 471, 131 N.E.2d 4 (1956), in support of its argument. Plaintiff's argument is misplaced.

In *Bays,* landowner Haven owned a tract of land identified as Lot 1, and entered into a real estate contract to purchase a separate tract of land identified as Lot 7. *Bays,* 777 P.2d at 563. Haven then constructed a driveway across Lot 7 to access his cabin located on Lot 1. *Id.* at 563–64. Because of a cloud on the title to Lot 7 and subsequent sale to another purchaser, Haven never acquired fee ownership of Lot 7. *Id.* at 564. Bays subsequently purchased Lot 1 and sought an implied easement as to the driveway across Lot 7. *Id.* Lot 7's owner argued that there was never unity of title over Lots 1 and 7, and thus that an implied easement failed as a matter of law. However, the Washington Court of Appeals found Haven to have owned both Lots 1 and 7 at the time he burdened Lot 7 with the driveway. *Bays,* 777 P.2d at 564–65. Relying on Washington case law as to real estate contracts, the Washington court determined that under the real estate contract entered into as to Lot 7, Haven had substantial rights in the property, including the "right to possession of the land, the right to dominion and control of the land, and the right to cultivate and harvest the crops grown on the land." *Id.* at 564. "Under Washington case law a purchaser under an executory real-estate contract has substantial rights and is clearly the beneficial owner of the real property." *Id.* at 565. Thus, Haven's control over and "title" to Lot 7 arose by virtue of the real estate contract entered into for his purchase of the lot. In the instant cause, Frederick Lenertz held a partial interest with his brother in the Drop

Lot property and a partial interest with numerous other individuals in the warehouse properties. Frederick never owned the properties outright in fee, nor did he ever attempt to do so. Given the circumstances of the instant cause, plaintiff's reliance on Washington case law based in real estate contracts is misplaced.

Plaintiff's reliance on *Malerba* is likewise misplaced. In *Malerba*, Mr. and Mrs. Warren owned a parcel of land which was subdivided into four separate lots, two of which were separately conveyed to their daughters, Mary Kim and Nancy Lee. *Malerba*, 464 N.Y.S.2d at 837. Mary Kim was owner of record of Lot 3 and Nancy Lee was owner of record of Lot 2. Mr. and Mrs. Warren reserved full use of the properties, however, for whatever purposes they deemed fit. Thereafter, at Mr. Warren's direction, a utility pole was erected on Lot 3 to service Lot 2. Mr. Warren signed the agreement with the light company for such placement. *Id.* The Malerbas subsequently purchased Lot 2 and sought an implied easement as to the utility pole on Lot 3 which provided electricity to Lot 2. *Id.* The Appellate Division of the Supreme Court of New York determined that although Lots 2 and 3 were separately owned by Mary Kim and Nancy Lee by title at the time the utility pole was erected, there nevertheless was unity of title inasmuch as Mr. and Mrs. Warren exercised dominion and control over these lots at the time in question. *Id.* This determination was based on evidence which showed that, despite the conveyances to their daughters, Mr. and Mrs. Warren "continued to treat all four lots as their own until lot 2 was conveyed to the Malerbas." *Malerba*, 464 N.Y.S.2d at 837. In the instant cause, Frederick held partial ownership interests in both the Drop Lot and warehouse properties. However, the evidence before the Court shows that Frederick did not, and could not, treat these properties as his own. As to the Drop Lot property, for example, Frederick could not unilaterally establish easements across the property; Lawrence's assent was required for such easements, and the undisputed evidence before the Court shows that Lawrence was reluctant in his assent. Thus, although Frederick conducted operations on the Drop Lot, he was unable to unilaterally encumber the property, unlike the circumstances in *Malerba*. As to the warehouse properties, the undisputed evidence shows that Frederick leased the properties and conducted warehouse operations. However, by virtue of the Lease Agreements and Joint Venture Agreements, Frederick was unable to treat the properties as his own and was required to seek approval by the JV entities in relation to certain aspects of the properties. (Lenertz Affid. Exhs. C–1, C–2, D–1 D–2.) Thus, although the evidence before the Court shows that Frederick Lenertz operated the *businesses* upon the properties in question, he nevertheless could not exercise unilateral dominion and control over the land upon which the businesses were located. Therefore, Frederick Lenertz did not have unity of title in both the Drop Lot and warehouse properties, and the holding in *Malerba* is inapplicable.

Finally, in *Cosmopolitan Nat'l Bank*, two individuals, Trinz and Lubliner, owned a single tract of land which they subsequently divided by trust deeds into two separate properties. *Cosmopolitan Nat'l Bank*, 131 N.E.2d at 6. Trinz and Lubliner then organized two separate corporations in which they owned all of the shares of stock equally, with a qualifying share being held by Lubliner's wife. Trinz, Lubliner and Lubliner's wife were the incorporators, subscribers, stockholders, and directors of both corporations. *Id.* After forming these corporations, Trinz and Lubliner conveyed one of their properties to one corporation and the remaining piece of property to the other corporation. Thereafter, buildings were erected on the properties with a paved area between them. *Id.* at 6–7. Five years later, one of the properties was sold to James J. Brown, and Mr. Brown sought an implied easement as to the paved area between the buildings. *Id.* at 7. The Supreme Court of Illinois determined that although technically the properties were separately owned by the separate corporate entities at the time the paved area was installed, there nevertheless was common ownership over the properties inasmuch as Trinz, Lubliner and Lubliner's wife

were the sole stockholders, directors and subscribers of the capital stock of each of these corporations. Even after the corporations were organized, Trinz and Lubliner individually paid the real estate taxes on each parcel of property. Moreover, Trinz and Lubliner applied for and received the building permits in their individual names; and they were in charge of the management and operation of both buildings until the conveyance of the apartment property to Brown.

*Cosmopolitan Nat'l Bank,* 131 N.E.2d at 7. Therefore, the court found that the corporations were "merely instrumentalities of the individuals who remained the real parties in interest with power to arrange and adapt the properties." *Id.* In the instant cause, three separate groups owned the properties in question. The Drop Lot property was owned by Frederick and Lawrence Lenertz as tenants in common. The warehouse properties were owned in part by JV–1, whose owners were Frederick Lenertz, Carl Gene Penzel, Gary Stanley, Carl L. Penzel, and Richard L. Kies; and JV–2, whose owners were Frederick Lenertz, Carl Gene Penzel, Lester A. Maevers, Carl L. Penzel, and Leo Kohlfeld. Thus, unlike *Cosmopolitan Nat'l Bank,* the properties here were not commonly owned by any individual or group of individuals. Although the entities here may be mere instrumentalities of individuals who remained the real parties in interest, the entities were comprised of different individuals and thus these individuals did not own the entire tract of land at issue. Therefore, under *Cosmopolitan Nat'l Bank,* unity of title cannot be found in the instant cause.

Inasmuch as the undisputed evidence before the Court demonstrates that there was never common ownership over the Drop Lot and warehouse properties at issue in this cause, plaintiff cannot establish unity of title over the properties. As such, plaintiff's claim of an easement by implication across the Drop Lot property fails as a matter of law.

### C. *Easement by Necessity*

 An easement by necessity over the land of another is established when the claiming party otherwise has no means of access to his property from a public road. *Evans v. Mansfield,* 364 S.W.2d 548, 551 (Mo.1963). If the party, however, has a legally enforceable right of way to his property, he does not have a right, by necessity, to a way over another's land. *Id.* The way sought must be a way of strict necessity and not mere convenience. *Id.*

 Where a party has an enforceable easement to a public road, he has no right to a private road by necessity. *See Farrow v. Brown,* 873 S.W.2d 918, 920 (Mo.Ct.App. 1994). However, the easement to the public road must provide reasonable and practical access to and from the party's property. *See Evans,* 364 S.W.2d at 551. "The law does not contemplate that a way is reasonable and practical if it would require an expenditure of an unreasonable amount of money in order to construct and maintain it in a dependable, usable condition." *Id.*

 The plaintiff here has a legally enforceable easement to Highway 177 by virtue of the 40–foot easement established by the Joint and Mutual Easement Agreement executed in September 1986. As such, plaintiff has a way of ingress and egress to its property and thus does not have a right to a private road by necessity. Plaintiff argues, however, that this easement does not provide a "reasonable, practicable way to use the warehouses which by their nature were designed for heavy semi-trailer trucks and trailers, to use the docks in a counter-clockwise fashion." (Pltf.'s Resp. to Mot. Sums. Judg. at p. 10.) Plaintiff does not argue that the condition of the easement itself is not reasonable or practical, but that the position of the easement does not provide a reasonable or practical way to use the warehouses. Plaintiff argues that it would be more reasonable and practical to have an easement across the Drop Lot which would allow the semi-trailers direct access to the southeast corner of the warehouses.

Missouri courts have found easements by necessity where the condition of an already existing easement is rendered to be unreasonable and impractical. In *Evans,* the Missouri Supreme Court determined an existing

easement to be impractical inasmuch as it traversed "such rough and rocky terrain that it [could not have been] kept in usable condition by the expenditure of reasonable sums for maintenance." *Evans,* 364 S.W.2d at 551. In *Farrow,* use of a prescriptive easement became impractical inasmuch as a creek running through the easement made the way impassable. *Farrow,* 873 S.W.2d at 920. Plaintiff does not argue that the condition of the existing easement here is itself unreasonable or impractical, but rather that the placement of the easement renders use of its property unreasonable or impractical. The undersigned is aware of no authority which establishes an easement by necessity so that property which already has a legally enforceable way of ingress and egress may be better used, nor does the plaintiff refer to any such authority. To grant plaintiff such a way across the Drop Lot property "would simply mean compelling the defendant, against his will, to sell plaintiff a strip of land which plaintiff deemed necessary to the proper operation of its plant. This cannot be done under our fundamental law." *Seitz Packing & Mfg. Co. v. Quaker Oats Co.,* 343 Mo. 1059, 124 S.W.2d 1177, 1179 (1938). Although it may be more convenient to use plaintiff's property if tractor-trailers were allowed to cross the Drop Lot property so that they may enter the warehouse properties at the southeast corner, mere convenience is an insufficient basis upon which to find an easement by necessity. *Farrow,* 873 S.W.2d at 920 n. 2; *Evans,* 364 S.W.2d at 551.[2]

Therefore, defendants should be granted judgment as a matter of law as to plaintiff's claim that it is entitled to an easement by necessity across the Drop Lot so that tractor-trailers may directly access the southeast corner of plaintiff's warehouses.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that defendants Frederick G. Lenertz, Sr. and FGL Holdings, Inc.'s Motion for Summary Judgment on All Claims (Docket No. 49–1) is granted.

**IT IS FURTHER ORDERED** that defendants Frederick G. Lenertz, Sr. and FGL Holdings, Inc.'s Motion for Dismissal of the Claim for Reformation of Deed (Docket No. 49–2) is denied as moot.

**IT IS FURTHER ORDERED** that all motions which remain pending in this cause are denied as moot.

Judgment shall be entered accordingly.

---

**2.** Although plaintiff makes no argument as to the condition of the easement itself, the undersigned notes that the easement is unimproved and that a portion of the easement is not on the graded Drop Lot but rather is located on a hillside sloping away from the Drop Lot. However, evidence before the Court shows that Lipps, owner of a construction company as well as CWI, estimated that the easement could be improved and made usable for $5,000.00. Inasmuch as the assessed value of the warehouse property was decreased by $125,000.00 to accommodate construction on the easement; that the list price of the warehouse properties was reduced by over $1 million due, in part, to the easement problem; and that plaintiff paid $2.6 million to purchase, the warehouse properties, an expenditure of $5,000.00 to make the easement usable does not appear to be an unreasonable amount of money needed to construct and maintain a reasonable and practical way. *Cf. Evans,* 364 S.W.2d at 551; *Wiese v. Thien,* 279 Mo. 524, 214 S.W. 853, 856 (1919) (way of necessity established where construction of road across own land would be confiscatory inasmuch as cost of construction would be as much or more than value of land).